THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BERT HAMILTON, Plaintiff in Error.

*Opinion filed June 24, 1915.*

1. CRIMINAL LAW—*when motion to correct record is properly denied.* A motion to correct the record to show that the grand jury returned the indictment to the clerk of the court after the adjournment of court instead of in open court prior to adjournment, as disclosed by the record, which motion is supported by the affidavit of the defendant's attorney, is properly overruled.

2. SAME—*there must be no prejudicial error where the case is close upon the facts.* If the evidence in a criminal case is conflicting and the case is close upon the facts it is important that no error shall intervene which may prejudice the accused.

3. SAME—*refusal to limit opening statement of State's attorney to its proper scope is error.* While it is the privilege of the State's attorney to make an opening statement of what he intends to prove, yet the purpose of such statement is to advise the jury concerning the questions of fact involved, and it is error for the court, over the objection of the accused, to permit the State's attorney to detail at length and with great minutia all the alleged facts and circumstances surrounding the assault, many of which are of a revolting character and some of which are not proved, though of a very damaging nature.

4. SAME—*conclusion of a witness as to what caused change in demeanor of accused is improper.* If there was any change in the demeanor of the accused after the alleged crime it is proper for a witness to state what change he observed, but it is improper to allow him to state his conclusion that the accused acted as if there was something on his mind more than usual.

5. SAME—*in a prosecution for rape, proof of complaint should not name the accused.* In a prosecution for rape it is proper to permit the People to prove by the complaining witness that she made complaint soon after the assault, but it is improper to allow

her to state, in testifying to such complaint, that she named the accused as the person who made the assault.

6. SAME—*what testimony by father of complaining witness is competent.* Testimony by the father of the complaining witness in a prosecution for rape that he went to the room of the accused on the night of the alleged crime and found him asleep, and that he was naked except for a porous undershirt, is competent, where the complaining witness had testified that the accused was clad in that manner when he entered her room late that night.

7. SAME—*it is not proper to permit the mother of complaining witness to repeat statements made by her.* It is proper to allow the mother of the complaining witness in a prosecution for rape to state that after the alleged assault her daughter appeared at times to be nervous and was slower about her work than usual, but it is not proper to allow her to repeat statements made by her daughter, in order to disclose the condition of the child or any change in her condition from what it had been.

8. SAME—*when questions by the State's attorney are prejudicial though objections are sustained thereto.* In a prosecution for rape, questions asked by the State's attorney, on cross-examination of the accused, which are intended to convey, and succeed in conveying, to the jury the intimation that the accused had at some time and for some reason been in jail at a certain place are prejudicial even though objections were sustained to them, where there was nothing in the direct testimony of the accused to warrant such cross-examination.

9. SAME—*what conduct by State's attorney is improper.* It is improper for the State's attorney, in a prosecution for rape, to endeavor to discredit the accused and prejudice him in the minds of the jury by asking him questions concerning his actions and conduct having no relation whatever to the crime charged.

10. SAME—*what conduct by the trial judge is prejudicial.* It is prejudicial error for the trial judge, in a criminal case, to interrupt, without justification, the argument of defendant's counsel, who was keeping within the record, and to reprimand and criticise him, and thereafter refuse to sustain defendant's objection to a mis-statement of the evidence by the State's attorney, with the remark to defendant's counsel that he wanted "that silly objection stopped."

WRIT OF ERROR to the Circuit Court of DeKalb county; the Hon. CLINTON F. IRWIN, Judge, presiding.

A. G. KENNEDY, for plaintiff in error.

P. J. LUCEY, Attorney General, LOWELL B. SMITH, State's Attorney, and GEORGE P. RAMSEY, for the People.

Mr. JUSTICE COOKE delivered the opinion of the court:

Plaintiff in error, Bert Hamilton, was convicted of the crime of rape, in the circuit court of DeKalb county, and sentenced to eighteen years' imprisonment in the penitentiary.

The record discloses that the indictment was returned in open court on the 29th of October, 1913, being one of the days of the October term. On March 19, 1914, at a subsequent term, a motion was made to correct the record of October 29, 1913, to show that court adjourned on that day to November 3, 1913, and that the grand jury returned the indictment to the clerk after the adjournment. This motion was supported by the affidavit of Hamilton's attorney. The court did not err in overruling the motion. *Hansen* v. *Schlesinger,* 125 Ill. 230; *West Chicago Street Railroad Co.* v. *Morrison, Adams & Allen Co.* 160 id. 288.

The grounds urged for reversal are, that the verdict is contrary to the evidence; that the opening statement of the State's attorney was improper and prejudicial; that the court erred in the admission of evidence; that the cross-examination of Hamilton was improper and prejudicial, and that the court made improper and prejudicial remarks in the presence of the jury during the trial of the cause.

The state of the evidence is not such that it will not sustain a verdict of guilty, as is claimed by the plaintiff in error. Neither is it such, as is claimed by the People, that it discloses so clearly Hamilton's guilt that the judgment should be affirmed notwithstanding any errors which may have intervened. The verdict does not rest, as plaintiff in error contends, upon the uncorroborated testimony of the complaining witness. The case is a close one upon the facts, but there is sufficient corroboration of the testi-

mony of the complaining witness to have sustained a verdict of guilty had the trial been free from prejudicial error.

At the time the crime is alleged to have been committed the complaining witness was eleven years of age. She testified that the assault was made upon her in the night time, while she was in her bed; that the next morning there were blood-stains upon her nightgown, and later that there were blood-stains upon the clothing she wore the next day, and that this blood came from her private parts as the result of injuries received at the time of the assault upon her. Her mother corroborated this by testifying that she observed blood-stains upon the nightgown and underclothing immediately thereafter when she was doing the family washing. The complaining witness also testified that Hamilton attempted to penetrate her rectum as well as her private parts, and the mother testified to the fact that the child was thereafter constipated. Eighteen days after the assault is alleged to have been committed a medical examination of the child disclosed that her hymen had been ruptured. Although there are some facts shown which tend to support the theory of innocence aside from the positive testimony of Hamilton denying the testimony of the complaining witness, we cannot say that the verdict is so contrary to the weight of the evidence as to warrant a reversal of the judgment. The evidence in the case, however, was conflicting, and the case was so close upon the facts as to make it of the utmost importance that no error should intervene which might prejudice the accused.

The facts which the testimony tended to prove, so far as they are material in the discussion of the errors assigned, are as follows: The complaining witness lived with her parents upon a farm in DeKalb county about four and one-half miles from Hinckley. Her father employed Hamilton to work for him upon the farm on May 17, 1913. The family consisted of the father and mother, the complaining witness, then about eleven years of age, and a son,

then seven years of age. Hamilton and the little boy slept in a room up-stairs. Immediately across a hall was the room occupied by the complaining witness. The father and mother occupied a bed-room down-stairs. The alleged assault occurred on the night of June 19, 1913, about midnight, the complaining witness testifying that Hamilton entered her room, got into bed with her and forcibly had intercourse with her; that she turned over and he then attempted to insert his penis into her rectum. She made no outcry, giving as the reason that he threatened to kill her if she did so; that he threatened to horse-whip her and burn down the house if she ever told, and that a part of the time he held his hand over her mouth. She testified that the next day she told her little brother what had occurred. She also testified that previous to this time, on one occasion when she was at a corn-crib situated between the barn and the house, Hamilton approached her from the barn with his private parts exposed and holding his penis in his hand and followed her when she ran from him into the house, and at that time threatened to burn the house down and leave her father's employ if she told her parents what he had done. After the alleged assault she told no one else about it until Sunday, July 6, when she told her parents.

On Friday, July 4, Hamilton borrowed a horse and buggy from his employer, drove to Hinckley, where he left the horse, and from there went by train to the city of Aurora to spend the day. His employer and family attended a family picnic that day at Big Rock. While there the complaining witness told one of her cousins of the circumstance of Hamilton chasing her from the corn-crib to the house. This cousin told her mother, who in turn told the mother of the complaining witness, and on the way home from the picnic this circumstance was told to the father of the girl. Hamilton did not return from Aurora on the evening of the 4th as he had promised his employer but

came to Hinckley the next morning on a train, arriving there between ten and eleven o'clock. The father of the complaining witness also went to Hinckley that morning, arriving there about the same time. He met Hamilton on the street, and Hamilton asked him for $10 to apply on his wages. This he received, whereupon his employer asked him if he intended to take the horse and return to the farm, and he said that he did. His employer afterwards went to the livery stable, paid the feed bill and took the horse home, leaving word with the liveryman to tell Hamilton that he had taken the horse and that it would be all right for him to come back to work if he wanted to, and if he did not want to come back it would be all right. It is not claimed that any reference whatever was made on this occasion to the story which had been told to her parents by the complaining witness in reference to Hamilton's conduct. When Hamilton discovered, shortly thereafter, that his employer had taken the horse away he called him by telephone and asked him why he had done so. There is some dispute in the testimony as to just what conversation occurred at this time, Hamilton claiming that on this occasion his employer told him if he did not return to work he would prefer a charge against him with the complaining witness. The father testified that the statement in reference to preferring a charge against Hamilton was made in another telephone conversation later in the evening, and that he did not name his daughter but simply stated that it was a charge with the children. During the afternoon or evening of that day Hamilton stated to a deputy sheriff, who resided in Hinckley, that his employer was threatening to make a charge against him, and the next day he stated to him that his employer was charging him with an offense against the complaining witness, and asked him to direct him to some doctor, stating that he desired an examination of the girl by a physician in order to determine whether any assault had been committed upon her. The next morn-

ing Hamilton saw the family physician of his employer, who resided in Hinckley, and after informing him that some such charge was being threatened against him, requested him to go out and make a physical examination of the girl. The complaining witness testified that on Sunday, July 6, she told her parents of the assault which had been made upon her on June 19, and Hamilton was arrested that evening.

In his opening statement the State's attorney related to the jury all of the alleged facts and circumstances surrounding the assault and detailed at length and with great minutia what the testimony would be. Considering the nature of the offense charged, much of this was necessarily of a revolting character and such as would naturally tend to inflame the passions of any properly constituted man. The State failed to prove some of the alleged facts detailed in this opening statement, which, if proven, would have been very damaging. Repeated objections were made to the character of the opening statement, and it is now claimed that it was prejudicial to permit this character of statement to be made. The attorney for either side is privileged to make an opening statement of what he expects to prove. The purpose of such a statement is to advise the jury concerning the questions of fact involved and to prepare their minds for the evidence to be heard. The extent of the statement and how full it shall be made, within reasonable limits, is left to the discretion of the attorney, but the only purpose is to give the jury an idea of the nature of the action and defense. (*Pietsch* v. *Pietsch,* 245 Ill. 454; *People* v. *Arnold,* 248 id. 169.) To relate the testimony at length will not be tolerated. (*Pietsch* v. *Pietsch, supra.*) When objection was made the court should have required the State's attorney to limit his opening statement to a proper scope, and should not have permitted him to detail at such length and with such minuteness the testimony he expected to produce.

During the examination of the father of the complaining witness he was asked concerning the relations between his family and Hamilton during the time he worked there and if he had ever noticed anything wrong. He stated that he had not until the last week, when Hamilton would hang his head when he came to the table and would not look at anybody, as if there was something on his mind more than usual. This was objected to and a motion made to strike out that part of the answer which stated that he acted as if there was something on his mind more than usual. The objection was overruled and the motion to strike denied. This testimony was improper. It was proper to prove Hamilton's conduct if it was such as to have any bearing upon the case, but it was not proper for the witness to give his conclusion as to what caused any change there may have been in his demeanor.

During the direct examination of this witness he was asked concerning the telephone conversations he had with Hamilton during the afternoon and evening of Saturday, July 5. In relating these he stated that he told him in one of the conversations that he had a charge with the children to bring against him, and that when Hamilton wanted to know what the charge was, he told him he would not tell him over the telephone. The witness was then asked what the charge was that he had at that time with the children. To this question an objection was interposed and overruled, and he stated that the charge was chasing the little boy around the barn with a pitchfork and throwing it at him, and chasing the little girl around the corn-crib with his privates exposed. After the answer had been made the court sustained a motion to strike it out. Counsel for Hamilton then asked the court to instruct the jury to disregard this answer, to which the court replied, "I have no right to." This action of the court would not be subject to serious complaint if it were not for his subsequent attitude during the course of the trial. It is not incumbent

upon the court to give verbal instructions to the jury, during the taking of testimony, to disregard matters which have been stricken from the record, although this is frequently done. Counsel may always have an instruction given at the close of the case that the jury shall disregard all matters stricken from the record. Thereafter, during the trial, the court several times of his own motion, and without any objection being made on the part of the People, instructed the jury to disregard certain matters stricken and statements made, and the jury might well have drawn the conclusion that it was proper for them to consider this testimony although it was stricken.

The State was allowed to show by the complaining witness that on June 20 she told her brother what Hamilton (referring to him by name) had done to her the night before. This was objected to, and the objection and a motion to strike were overruled. She was also permitted to testify, over objection, that she had told her parents on Sunday, July 6, what Hamilton (also referring to him by name) had done to her, and motions to strike this testimony were denied. This character of proof is only proper as evidence of the fact that a complaint was made by the person upon whom a rape was committed, and it is not proper to prove, in this connection, who was claimed to have committed the offense. (*Bean* v. *People,* 124 Ill. 576; *Stevens* v. *People,* 158 id. 111.) The only probative force of such testimony is, that it is a circumstance tending to sustain the truth of the statement of the complaining witness that an assault had been committed upon her. It was error to permit her to testify that in these conversations she named Hamilton as the person who made the assault.

On the night the assault is alleged to have been committed Hamilton was the first of the family to retire. Later in the evening the father of the complaining witness took his little son up-stairs to put him to bed. He testified that when he entered the room occupied by Hamilton he was

lying in bed, asleep; that he had nothing on but a light undershirt made from material which was porous or full of little holes; that aside from this garment he was naked. It is insisted that it was error to admit this testimony showing the exposed condition of Hamilton while he was asleep. That was not the purpose for which this testimony was admitted. The complaining witness testified concerning the way in which Hamilton was dressed at the time it is alleged he entered her room later that night, and her testimony corresponds with that of her father. It was not error to admit this testimony.

The mother of the complaining witness was permitted to testify that on the morning after the assault is alleged to have been committed her daughter told her she did not feel good and that the day after that she told her she did not sleep good; that she said she was constipated, and was using talcum powder on her person, as she was sore. It was competent for this witness to state, as she did, that her daughter appeared at times to be nervous, was slower about her work than usual, and that it was necessary for her to give her an enema to produce a movement of the bowels, but it was not proper to permit her to repeat the statements made by her daughter in order to disclose the condition of the child or any change in her condition from what it had been.

Hamilton testified in his own behalf. His testimony in chief covered the period from the time he began working for the father of the complaining witness down until after his arrest. On cross-examination he was asked about the death of his wife, which occurred about 1905, and was asked if he had not been in Geneva, Illinois, some time before that. This question was objected to and the objection overruled. He stated that he had been there, and was then asked, "Where were you?" To this question an objection was sustained, whereupon he was asked, "What were you doing in Geneva?" to which an objection was sustained.

To the question, "How long were you down at Geneva?" an objection was overruled, and he said he had been there about three months. He was then asked, "In where?" to which an objection was sustained. He then testified that he did not remember whether he went back to Geneva shortly after the death of his wife, and, over objection, that he did not remember where he had been for the three months succeeding June 22, 1905, but that he was teaming at North Aurora right after his wife died. He was then asked, "Isn't it true, Bert, you were in Geneva from June 22 until September 21, 1905?" To this question an objection was overruled, and he was asked, "Do you remember that now, Bert?" to which he replied that he did not. The State's attorney then asked him, "Were you not in jail at Geneva during that time?" The court sustained an objection to this question. No part of this examination was proper cross-examination. It had no reference to any subject inquired about in the examination in chief and could have no possible connection with the commission of the alleged offense. Every objection made to the questions asked in reference to this subject should have been sustained. A sufficient number were sustained to indicate to the State's attorney that the examination was improper, but he persisted until he finally arrived at the desired goal and succeeded in conveying the intimation to the jury that Hamilton had been at some time and for some reason confined in the jail at Geneva. This conduct of the State's attorney was improper, and such a practice will not be tolerated. While an objection was sustained to the last question asked, it cannot be said that no harm was done.

Immediately following this examination Hamilton was asked if, after the death of his wife, he had not left his daughter with his mother-in-law. He responded that he had, and that he had lived there for a while but could not remember just how long. He was then asked, "Isn't it true that during all these years you didn't live with your

daughter at the home from then on, after your wife's death, until the present time?" and, "Your mother-in-law adopted your daughter, did she not, Bert?" and, "Did you contribute to the support of your daughter while at the home of your parents?" To each of these questions an objection was sustained, but the mere asking of such questions was prejudicial. There is no possible theory upon which it can be claimed that such an examination was competent, and it seems incredible that a State's attorney should so far forget the duty devolving upon him in a criminal prosecution as to adopt such methods to attempt to discredit a defendant and to endeavor to prejudice the jury against him.

There being a dispute between Hamilton and the father of the prosecuting witness as to the time when Hamilton was informed that a charge might be preferred against him, and the time when this actually occurred having become important to determine whether Hamilton had made his statement to the deputy sheriff in reference to the charge with which his employer was threatening him before he had received this information over the telephone, the State attempted to show that on the afternoon of Saturday, July 5, Hamilton was drunk and therefore not likely to remember the events which transpired, in their proper sequence. On cross-examination he was asked if he was not pretty drunk that afternoon and evening. He answered that he was not drunk at all on that day. The State's attorney then asked him, "You had been locked up in Aurora for being drunk on the Fourth?" To this question an objection was interposed. Thereupon the court said: "That might be competent to show his ability to tell the telephone conversation,—what happened the day before; whether he could remember it or not. Here is a drunken man. Now, there is a question of whether he remembers. On that ground it might be competent." The ruling and remarks of the court were excepted to. If Hamilton was in such a

condition, whether from drunkenness or any other cause, as to be unable to remember what occurred it was proper to show it. What his condition had been the day before, unless it continued the same, had no bearing whatever and was not proper to be shown. The question asked did not attempt to elicit what his condition had been in Aurora the day before, but was meant to disclose the fact that he had been placed in jail. The question was improper and the objection should have been sustained. The remarks of the court in overruling the objection were prejudicial, and might well have had the effect of causing the jury to believe that it was the opinion of the court that this man was drunk on Saturday afternoon and that it was a serious question whether he could remember what had occurred. In this same connection Hamilton was required to state, over objection, how much money he had left that Saturday evening, as having a bearing upon whether he was drunk or sober, although he had testified in his direct examination that after he had received the $10 from his employer he re-paid a man some money he had borrowed, without stating the amount. The State's attorney also inquired in reference to a conversation which Hamilton was supposed to have had that evening with Ed Myers,—a man who hired him that afternoon to work for him,—and asked him, over objection, if Myers did not tell him he would not take him home with him that evening because he was drunk, and that he would not take him home until Sunday morning, as he was too drunk to ride in the buggy with Myers' wife. He was also asked if he was not drunk that evening while in the company of certain other persons. The witness had already denied that he was drunk on that occasion. It appears from his testimony that he had seen and talked with a number of people in Hinckley that afternoon and evening, and it also appears from the cross-examination that the State's attorney was aware of that fact. If Hamilton was testifying falsely as to his condi-

tion in regard to sobriety at that time, the State's attorney should have summoned as witnesses the parties who had seen him that afternoon and talked with him. No attempt was made to contradict his testimony on this subject, the State's attorney simply contenting himself with asking him in reference to his dealings with various persons and what they had said to him in reference to his condition. If the State's attorney deemed it important to show Hamilton's condition as to sobriety on this occasion he should have done so in a proper way.

A witness by the name of Crosby testified on behalf of the People that he had been an inmate of the county jail at Sycamore during the time Hamilton had been confined there, and he testified to some statements made by Hamilton while in the jail which would indicate his guilt. On cross-examination he admitted that counsel for Hamilton, in company with Howard Stevens, had called upon him at the jail, but denied that the attorney had said to him: "Now, I have been appointed by the judge to defend Hamilton; have you ever heard him make any crack that might lead you to believe him guilty of such an act?" and denied that he also asked him, "Did you ever hear him say he was innocent?" or that he replied, "He always says he is innocent." Howard Stevens testified that he accompanied Hamilton's attorney to the jail and that he heard him ask Crosby these questions and heard him reply to the first one that he had not heard him make any such statement, and to the second, that "he always says he is. innocent." In his argument to the jury counsel for Hamilton stated: "And I asked him [referring to Crosby] the questions, and you know what they were. I said to him, 'Now, I have been appointed by the judge to defend Hamilton; have you ever heard him make any cracks that might lead you to believe him guilty of this crime?' His answer was, 'No.' And I asked him this question, 'Did you ever hear him say he was innocent?' and he replied, 'He always says he is inno-

cent.' " No objection was interposed to this portion of the argument by the State's attorney, but the court of his own motion interrupted and said, "I am afraid you are going to the limit when you are testifying to what you said, when you are not under oath." Counsel for plaintiff in error excepted to the remarks of the court. The court then proceeded: "Let the record show that the attorney was giving what he said to one of the witnesses that he was interviewing when he was not under oath and the court says it is not proper." Counsel again excepted to the statement of the court, whereupon the court said, "The court allows the exception and repeats the statement." Counsel again excepted, whereupon the court said, "And I allow it again, and repeat to the jury not to regard this testimony as it is highly incompetent." One of the witnesses for the People was Dr. Graves, who testified to the physical condition of the complaining witness on July 7. During his cross-examination counsel for Hamilton asked him if he had not interviewed him on the 7th of November, and if he did not state to counsel at that time that he knew that the complaining witness had menstruated before the time of the alleged offense, to which the doctor responded that he certainly did but that he had made a mistake, as he found out afterwards that was not the case. During his argument to the jury Hamilton's counsel also said: "I said to Dr. Graves, 'Do you happen to know whether Ruth has ever menstruated or not?' " whereupon the court interrupted, without objection on the part of the State's attorney, and said, "I will not allow you to testify to any conversation between you and the doctor unless testified to by some witness." These interruptions and remarks of the court were wholly without justification. Counsel was keeping strictly within the record and was stating only what had been testified to by witnesses in the case. While it is the province of the court to interrupt counsel and caution him when he goes outside of the record, and it is perfectly proper for

him to do so, it should only be done when there is occasion
for it. Even when counsel commit the impropriety of go-
ing outside the record the court is rarely justified in using
the strong language which was used in this case, but as
counsel was clearly within the record the action and state-
ment of the court in this connection were clearly preju-
dicial.

The witness Stevens also accompanied Hamilton's coun-
sel when he interviewed the father of the complaining wit-
ness. On that occasion the attorney inquired concerning
the telephone communication with Hamilton on Saturday
afternoon, July 5. Stevens testified, both in his direct and
cross-examinations, that the father of the complaining wit-
ness stated that he had told Hamilton in that conversation
that if he did not come back to work he would make a
charge against him. In his closing argument to the jury
the State's attorney stated that while Stevens on direct ex-
amination testified that the father of the complaining wit-
ness, in relating that conversation, stated that he said if
Hamilton did not come back he would prefer a charge
against him, he denied it on cross-examination, and that he
testified that the father of the complaining witness did not
say that if he did not come back to work he would pre-
fer a charge against him. To this statement an objection
was made by Hamilton's attorney, whereupon the court
said: "Now, see here. Here are twelve intelligent men
who have heard the evidence, and you know better your-
self than to keep objecting. I want that silly objection
stopped." Hamilton's attorney excepted to the remarks of
the court, and the court continued: "You can have all
the exceptions you want. You can behave yourself while
you are here. Now proceed." The record discloses that
the State's attorney was mis-stating the testimony of the
witness Stevens. The court of his own motion had halted
the argument for the defense upon the theory that counsel
was going outside of the record. Counsel for the defense

had the right to insist upon the State's attorney being confined to the record in his discussion of, the facts testified to. While the trial court may have had in mind some better way of accomplishing this, it was proper for counsel to object to this statement and thus challenge the attention of the court and of the jury to the fact that the evidence was being misquoted.

Because of the errors indicated the court should have allowed the motion for a new trial. The judgment is reversed and the cause remanded.

*Reversed ·and remanded.*