(No. 26965.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* BRUNO JACKYMIAK, Plaintiff in Error.

*Opinion filed January 19, 1943.*

Benjamin C. Bachrach, Frank J. Ferlic, and Joseph D. Gannon, for plaintiff in error.

George F. Barrett, Attorney General, and Thomas J. Courtney, State's Attorney, (Edward E. Wilson, John T. Gallagher, and Melvin S. Rembe, of counsel,) for the People.

Mr. Justice Smith delivered the opinion of the court:

This is a writ of error to review a judgment of the criminal court of Cook county. Plaintiff in error was found guilty by a jury of the murder of Raymon Besserra. The jury fixed his punishment at death by electrocution. The killing occurred between 11:00 and 11:30 P. M. on Febru-

ary 7, 1942, at a tavern at 4458 Ashland avenue in the city of Chicago.

The theory of the People is that plaintiff in error and one Joseph Skupien entered the tavern together. There were some twenty persons in the tavern at that time. Plaintiff in error was armed with a sawed-off shotgun and a revolver. Skupien was armed with two revolvers. Upon entering the tavern, plaintiff in error loaded the shotgun and announced that it was a stick-up. This was repeated by Skupien. The deceased was a patron in the tavern. He started in the direction of plaintiff in error. Plaintiff in error discharged the shotgun, killing Besserra. Plaintiff in error then started toward the front of the tavern. Another patron grabbed him, and Skupien, during the struggle, shot and killed this patron. When he entered the tavern, plaintiff in error had a handkerchief partly over his face. After the shooting he made the statement, "That will teach you Mexicans not to fool around with white people." Thereupon, plaintiff in error removed the handkerchief from his face and was recognized by one of the patrons. He was subsequently arrested in a nearby alley in Skupien's automobile. At the time of his arrest there were found in the automobile a sawed-off shotgun, two revolvers and a box of shells. The third revolver was subsequently recovered from Skupien.

In the view we are compelled to take of the case from the record, it is unnecessary to make any extended statement as to the theory of the case, advanced in behalf of plaintiff in error. It is sufficient to say that he claimed that prior to the day in question, he had been assaulted and stabbed in this same tavern; that at one time prior to the killing here involved, he visited the tavern in company with a lady friend; that a patron of the tavern insulted her, and he was assaulted. He further claimed that on the night of the killing of Besserra, Skupien came to his home; that after they had drunk liquor together in several places,

Skupien called his attention to the fact that he had been assaulted in the tavern and that his girl friend had been insulted; Skupien demanded that plaintiff in error go to the tavern and avenge these indignities. He further claims that Skupien, under threats of violence, compelled him to enter the tavern and commit the crime. It seems to be conceded by both sides that Skupien was insane at the time.

An examination of the record convinces us that the jury may have been amply justified in accepting the People's theory. We may also assume that upon the evidence the jury was amply justified in inflicting the death penalty. Having reached this conclusion, it only remains for this court to determine whether or not prejudicial errors were committed in the trial of the cause. In determining whether such errors have intervened, we are not concerned with the guilt or innocence of the accused. Constitutional safeguards cannot be disregarded for the purpose of inflicting punishment, however merited the punishment may be. Whatever may have been the evidence as to the guilt of plaintiff in error, and whatever justification may be shown to merit the extreme penalty inflicted, he was entitled to a fair and impartial trial, free from substantial prejudicial errors, and conducted in the manner and in accordance with settled rules of procedure.

The first point urged for reversal of the judgment by plaintiff in error is the contention that it was error to permit the People to show that the deceased was married and had a family. The record shows that when the widow of the deceased was on the witness stand, she was asked by the assistant State's Attorney whether she had any children. This question was answered by her in the affirmative. The court sustained an objection to the question and answer. Both were stricken by the court. The jury was instructed to disregard both the question and the answer.

In the case of *Filippo* v. *People*, 224 Ill. 212, it was held that proof that the deceased was married and had a

family of children was error. In that case the death penalty was not inflicted by the jury. In this case, it was proper to prove by the widow of the deceased that she was his widow, purely as a matter of identification of the witness. The further question, however, as to whether she had any children was both incompetent and improper. The question should not have been asked, but in view of the fact that the court sustained the objection and immediately struck both the question and the answer and instructed the jury to disregard them, we do not regard this error, standing alone, as substantial and prejudicial.

It is next contended that the court erred in permitting the prosecution to prove that Skupien was dead. The prosecution justifies this proof on the theory that it had the right to show the death of Skupien, who was an eyewitness to the crime, as explanatory of the failure to call him as a witness. On the other hand, plaintiff in error speciously argues that it amounted to an insinuation which might convey to the jury the belief that Skupien either had been killed by the police or electrocuted for the murder. While it is true that whether Skupien was dead or alive was not an issue in the case, or a fact which tended to prove any issue in the case, we do not, in view of the record, regard this evidence as improper.

The third and most grievous error relied upon for reversal is the conduct of the assistant State's Attorney in the cross-examination of plaintiff in error. In his examination in chief by the attorney who represented him on the trial, plaintiff in error testified that he had registered on a certain date with the local draft board under the Selective Service Act. This, of course, was improper and wholly foreign to any issue in the case. This error of his counsel, however, did not open the door for the assistant State's Attorney to cross-examine him at length in regard to that subject. No one can read the cross-examination of plaintiff in error in the record without being forced to the con-

clusion that the assistant State's Attorney deliberately attempted by his cross-examination to prejudice plaintiff in error in the minds of the jury. The character of this examination and its purpose can be better understood from the examination itself. Insofar as such examination relates to the registration of plaintiff in error, it is as follows:

"Q. Where did you sign up for the draft? A. Between Marshfield and Ashland, the school.

Q. Are you sure about that now? A. Yes, sir.

Q. And you were not classified? A. No, sir.

Q. Never received a questionnaire? A. I received a questionnaire after I volunteered.

Q. After you went down to volunteer, is that right? A. Yes, sir.

Q. Did you fill out the questionnaire? A. Yes, sir.

Q. Did they classify you then? A. Not that I know of.

Q. As a matter of fact, Bruno, you never registered for the draft, isn't that true? A. I did.

\* \* \*

Mr. Grant: Where did you receive your questionnaire?

A. I received it at the address I live at, 1739 West 43rd.

Q. On what date did you receive it? A. I don't remember what date it was.

Q. But you did not receive it until after you had gone down to volunteer for the Army, is that right? A. Yes, sir, I received the questionnaire after I volunteered.

Q. Now, there is another reason why the Army would not accept you, and you know what it is, isn't that true?

Mr. Burke: I object, if the Court please.

Mr. Grant: Didn't they tell you down there why they would not accept you? A. No, sir.

Q. But it was not your teeth, isn't that true? A. It was the teeth.

Q. You want the jury to believe it was your teeth, is that right? A. That's the honest to God truth, it was my teeth.

Q. And the record shows that too, is that true? A. Yes.

Q. And you can tell us no other reason? A. No.

Q. And they told you they wouldn't down there?

\* \* \*

Mr. Grant: There is a reason why you could not join the Army if you wanted to and that reason we cannot bring before this jury without creating prejudicial error, is that true?

Mr. Burke: Motion to withdraw a juror.

The Court: Objection sustained.

Mr. Burke: I am going to ask the jury be instructed to disregard it and counsel be reminded this boy is on trial for his life and he is entitled to a fair trial.

Mr. Grant: He will get more of a fair trial than he gave Besserra.

Mr. Burke: Motion to withdraw a juror, if the court please.

The Court: Objection overruled.

Mr. Burke: I move the jury be instructed to disregard it.

The Court: The jury will be instructed to disregard it.

Mr. Grant: You read the papers, don't you?

A. Not all the time.

Q. Did you ever go down and offer your services to the Army after December 8th? A. After December 8th? Well, I knew I was —

Q. Did you ever go down there after December 8th and offer your services to the Army? A. I went there December 9th.

Q. You went there the 9th again? A. That was to get examined.

Q. Is that when you were told why you could not join? A. Well—

Q. By the way, didn't they take your finger prints down there when you offered to join the Army? A. No, sir.

Q. Are you sure of that? A. Positive.

Mr. Burke: And they don't until your induction.

Mr. Grant: Are you sure they did not take your finger prints? A. Positive.

Q. Then when was the next time after that that you went down and offered your services? A. Well, there was no use to go after that, after I was disqualified.

Q. That is what you figured. A. That's what they told me.

Q. Did you go down in January?

Mr. Burke: That has already been answered, if your Honor please.

The Court: He said he did not.

Mr. Grant: When we get it from him, Judge, I would like to go ahead with my cross-examination.

Mr. Burke: I object on the ground it is repetition. He has already answered the question.

The Court: Objection overruled. Let him answer.

Mr. Burke: Exception.

Mr. Grant: Did you go down there in the month of January and offer your services?

A. No, sir.

Q. Did you go down there in the month of February, before February 7th, and offer your services?

A. No, sir.

Q. Never went down there again, did you? A. No, sir.

Q. Did you ever go to the Navy and offer your services?

A. Well, I couldn't get in the Navy if I tried to get in the Army. They are more strict than the Army.

Q. Did you ever go to the Marines and offer your Services? A. No, sir.

Q. Did you ever go to the Coast Guard and offer your services? A. No, sir.

Q. Did you ever go to any other branch of the United States Army forces and offer your services? A. No, sir.

Q. You still had that same patriotic feeling, didn't you, on February 7th? A. Yes, sir.

Q. The same feeling? A. On December 7th.

Q. I mean during the month of January and up until February 7th, you still had the same patriotic feeling, didn't you? A. Yes, sir."

That this examination was deliberate and designed to prejudice the defendant clearly appears. It was not proper cross-examination of plaintiff in error on the subject of his registration for military service. It had no basis whatever in the record. It neither proved nor tended to prove the guilt of the accused, or any issue involved in the case. It was not justified under any circumstances by the mere fact that plaintiff in error was improperly permitted in his examination in chief to testify to the fact that he had registered. The assistant State's Attorney did not occupy the role of partisan counsel; he was the People's lawyer. It was his duty to see that both the State and the defendant received a fair trial according to the law of the land. The repeated insinuation by the prosecutor that plaintiff in error had never registered for the draft could only convey to the jury the impression that he had violated the laws of the United States and was a draft evader. Moreover, the questions propounded repeatedly carried the prejudicial inference that there was something in his past life which would prevent him from voluntarily entering the service of his country. He was cross-examined as to whether he had volunteered his services in the Army, the Navy, the Marines, the Coast Guard or any other branch of the armed forces of the United States. In one question it was

stated, "There is a reason why you could not join the Army if you wanted to, and that reason we cannot bring before this jury without creating prejudicial error." The same implication was conveyed by other questions, both by inference and by express words. The assistant State's Attorney persisted in cross-examining him and by imputing in his questions that the reason which he assumed, and which he was trying by grossly improper methods to bring before the jury, could not be disclosed to the jury "without creating prejudicial error." Such a cross-examination was positive error. (*People* v. *Gordon,* 344 Ill. 422; *People* v. *Lewis,* 313 id. 312; *People* v. *Green,* 292 id. 351; *People* v. *Reed,* 287 id. 606; *People* v. *King,* 276 id. 138; *People* v. *Newman,* 261 id. 11.) At one point in the cross-examination, when counsel for plaintiff in error suggested that he was entitled to a fair trial, the assistant State's Attorney made the statement in the presence of the jury "He will get more of a fair trial than he gave Besserra." Such a vicious, gratuitous statement should never be made in the trial of a cause. Whatever his crime, he was entitled to "more of a fair trial than he gave Besserra." He was entitled to a trial according to the law of the land and not according to mob violence. The courts cannot, and the prosecutor should not, in the trial of criminal cases, adopt or resort to the methods used by the accused in the perpetration of the crime for which he is being tried. No jury should be told that the acts of the accused in the commission of the crime should constitute the standard of fairness which should be accorded to him on the trial. In the case of *People* v. *Black,* 317 Ill. 603, we said:

"We have heretofore had occasion more than once to condemn the conduct of the State's counsel in asking improper questions or making uncalled-for remarks which had no bearing on the guilt of the accused of the crime they were being tried for but for the sole purpose of prejudicing them in the minds of the jury, and we have held

that the error will not always be cured by the court sustaining objections. [Citing cases.] * * * If the evidence of guilt is such that the State's Attorney believes a conviction is warranted it is his duty to try to secure a verdict of guilty, but it is never his duty to resort to unfair and improper methods to secure a conviction. His duty is to present to the jury, both in the introduction of the testimony and in argument to the jury, the evidence of the State upon which he relies, and this can be effectively done in accordance with the rules of law."

In *Berger* v. *United States,* 295 U. S. 78, 55 S. Ct. 629, the court said, referring to the conduct of a prosecuting attorney: "He may prosecute with earnestness and vigor— indeed he should do so. But while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one."

There is no possible theory upon which it can be claimed that the cross-examination of plaintiff in error in this case was competent or proper, and it seems incredible that a prosecuting attorney should so far forget the duty imposed upon him, in a criminal prosecution, as to adopt such methods in an endeavor to prejudice the jury. (*People* v. *Hamilton,* 268 Ill. 390; *People* v. *Bush,* 300 id. 532.) Timely and appropriate objections were repeatedly made to this cross-examination and to the remarks of the assistant State's Attorney. Trial courts have ample power to prevent such abuses and they should not hesitate in any case, to exercise the power to whatever extent may be necessary to prevent them. Such practice cannot be too severely condemned. It has no place in orderly procedure and violates every reasonable conception of our system of constitutional government.

It is further contended by plaintiff in error that the court erred in admitting evidence in rebuttal tending to

show that he had possession of the firearms used in the tavern, prior to the time of the killing. He denied such prior possession in his examination on the witness stand. This evidence, therefore, offered in rebuttal, was clearly competent.

It is finally contended that the court erred in giving two instructions to the jury. One of these instructions related to the defense of intoxication and the other to the defense of insanity. There was no evidence of either intoxication or insanity and no defense on either of those grounds offered. The abstract, however, does not show by whom these instructions were offered. Presumably they were offered by the State. They were clearly erroneous and should not have been given, whether offered by the prosecution or by the defense.

For the improper conduct of the assistant State's Attorney in the cross-examination of plaintiff in error, and other errors above indicated, the judgment of conviction cannot stand. The judgment is therefore reversed and the cause remanded to the criminal court of Cook county for a new trial.

*Reversed and remanded.*