THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GARY SPIKA, Defendant-Appellant.

First District (6th Division)    No. 1—90—1818

Opinion filed May 15, 1992.

Michael J. Pelletier and Gordon H. Berry, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Kathleen F. Howlett, and Sheila Macmanus, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LaPORTA delivered the opinion of the court:

Gary Spika was convicted in a jury trial of two counts of aggravated criminal sexual assault, unlawful restraint and kidnapping for an assault that occurred October 21, 1988, and charged on indictment No. 88—20441. He was sentenced to six years on each charge of aggravated criminal sexual assault and the charge of kidnapping with the sentences to run concurrently. On the same day he pled guilty to count II aggravated criminal sexual assault on indictment No. 88—20440 for a separate assault on the same victim that occurred November 18, 1988. He was sentenced to six years in prison with the sentence to run consecutive to the six-year sentence resulting from indictment No. 88—20441.

Defendant appeals the conviction on indictment No. 88—20441 alleging: (1) the trial court committed reversible error in permitting the State, on direct examination, to elicit an unprecedented amount of detail concerning the background and life situation of the complainant to improperly bolster her testimony and play on the sympa-

thies of the jury, in a case where complainant's testimony may not have been true, and she had a motive to testify falsely; (2) the trial court erred in instructing the jury that "evidence has been received that defendant has been involved in offenses other than that charged," because the evidence if believed showed only one other offense (alleged intimidation of the victim) rather than multiple "offenses," and a reasonable juror could read the instruction as assuming that defendant committed the other offense or offenses, whereas whether the offense(s) occurred was a contested issue for the jury to determine.

Defendant Gary Spika, 32, was charged with three counts of aggravated criminal sexual assault, three counts of criminal sexual assault, one count of kidnapping and one count of unlawful restraint. At trial, the victim, R.C., testified that at about 8 a.m. as she arrived for work she was forcibly taken from her place of employment in Broadview by a man whom she identified as the defendant. She testified that he grabbed her just before she entered the building where she worked. He started pushing her toward her car and she pushed back, saying "What are you doing?" "Please. I got to go to work." She testified that he told her: "You're not going to work. You are not going anywhere. You're coming with me."

R.C. testified that defendant had his arm locked around her neck as he unlocked the driver's side door of her car and pushed her into the front passenger seat. She testified that he started the car and pulled away. She pleaded with him to let her go, but he just told her he was going to drive out of State so she could never see her children again.

She testified that he drove her to a townhouse in La Grange Park where the two had lived together for two months and where the defendant still lived. She testified that on October 12, 1988, nine days before the assault, she had moved out of the townhouse. She testified that he dragged her across the street, in through the back door of the townhouse, up the stairs and locked her in the bedroom with him. She testified that he pulled her clothing off, forced her to engage in sexual activity with him and then let her go after she promised to return in the evening.

She testified that she drove straight to the police station and a police officer took her to the hospital. She testified that at the hospital she noticed a bite mark under her right breast which she said was caused by the defendant.

She testified that she was 33, divorced since 1982 and was the sole support for her three children ages 15, 14 and 12. She testified

that after her divorce she worked as a waitress and moved to Sauk Village. She testified about her work history. She stated she had worked as a volunteer fire fighter, attending classes once a week; as an emergency medical technician for a year, which required three months' training; and as a nursing home activity therapy worker for 11 months. She testified that at the time of the assault she was working as a lab technician in a Broadview company. She testified that she was 5 feet 7½ inches and 110 or 113 pounds at the time of the assault and defendant was 6 feet 4 inches and weight 220 pounds.

During R.C.'s testimony, defense counsel objected twice, arguing that the State had a right to elicit background information on the victim to a point but that this extensive testimony was irrelevant. The trial judge stated that he would allow the prosecutor to continue but cautioned that "[i]f this goes much longer, if there is any objection then I will have to rule on it."

R.C. testified that on November 18, several weeks after the assault, she stopped at the Brookfield Library to pick up her son and the defendant jumped out from around the corner of a building and started chasing her. She testified that she ran toward the building but the defendant caught her and dragged her to her car, prying the car keys out of her hand. She testified that he told her: "You're not going anywhere. You're coming with me" and then said, "Oh, we have to talk about what happened in court today."

She testified that she had been in court that day with regard to the October 21 assault. She testified that he pushed her into the car, climbed in, locked the car and started to drive away. She testified that he told her: "We're going to Wisconsin. You're never coming back. You're never going to see your kids now. I don't care what happens now to me. You did it. You told the judge these threats that I made to you." She testified that he told her he would shoot her, kill her, bury her body and throw her car in the lake.

On cross-examination, R.C. testified that she met the defendant in May of 1986 and started dating him a month later. She admitted that she had sexual relations with him on several occasions and signed an apartment lease with defendant for the townhouse, using the defendant's last name as her own.

She testified that on the morning of the assault there were cars travelling on the street near her office and near the townhouse but she did not scream out for help. She testified that when she was pushed into her car she did not press on the horn because the horn

was broken and she did not try to exit the passenger side because she felt she couldn't get away.

She denied telling the police that they entered the townhouse through the back door and testified that they entered through the front door. She testified that he had no weapon, that she did not hit him or scream out because he would have knocked her out, and that she was afraid of defendant and feared for her life. She testified that the defendant had never bitten her before during sex.

She admitted that on November 13, 12½ weeks after the assault, she and two of her sons went to breakfast with the defendant. She testified that the defendant gave her $10 for each of her kids because he owed her money. R.C. identified herself as the author of a note left in the defendant's apartment October 12 which said that R.C. and her children were leaving.

On redirect examination, R.C. testified that she was afraid he would beat her up and that is why she didn't try to climb out of the car, scream, attract the attention of others or struggle to get away. She testified that on November 13 she was picking her children up from religious education class and when the children saw the defendant they ran to the car, climbed in and she tried to drive away. She testified that the defendant waved her car down and begged her to stop and told her he was sorry and he would never bother her again. She testified that he said he was going to pay her back the money that he owed her and her children told her to let him in the car because he wouldn't do anything with the three of them there. She testified that when they went to breakfast she did not eat anything.

On re-cross-examination, R.C. testified that the reason she spoke to the defendant November 13 was because she thought if she let him talk and "say his prayers" he would not stalk her anymore. On redirect examination, R.C. testified that she let the defendant into her car, drove to breakfast and stayed at the restaurant with him because he had been bothering her since October 21. She said she tried to talk the defendant into leaving her alone.

Broadview police lieutenant Robert Dollins testified that he spoke with R.C. at about 1 p.m. October 21, 1988, after she came to the police station claiming she had been kidnapped and sexually assaulted. He testified that he took her to Loyola Hospital in Maywood and then took her to meet with an assistant State's attorney. He testified that on the next day a warrant was issued for the arrest of defendant but he was not at home when police went to his La Grange Park home. On October 28, defendant was arrested,

read his *Miranda* warnings and he signed a form stating that he understood his rights.

Under police questioning, the defendant told Dollins that he was sure he was working for an asphalt paving company on the date of the assault, October 21. Dollins testified that defendant told him he and the victim had consensual sex on either October 18 or 20. Dollins testified that after looking at a calendar, the defendant said he was not sure of the exact date, it could have been a week later. Dollins testified that he then interviewed the defendant's boss at the asphalt company and discovered defendant had not worked October 19, 20 or 21.

On cross-examination Dollins testified that R.C. told him the defendant took her through the front door of the townhouse and not the back. He testified that R.C. told him the defendant ripped her clothes off, but he stated that he did not believe her clothes were ripped. He acknowledged that the defendant was very unsure about the date when he and R.C. had consensual sex.

On redirect examination, Dollins testified that the defendant was only unsure about the date he had consensual sex but he was sure he had worked at the asphalt company on the day of the assault on October 21.

James P. Duff, who owns an asphalt paving business, testified that he had known the defendant 2½ years and that defendant had worked for him. He testified that on October 28, 1988, he told a Broadview police sergeant that his records showed the defendant did not work on October 21, 1988. He testified that defendant did work on October 20.

Dr. Beatrice D. Probst, who worked in the emergency department at Loyola University Hospital in Maywood, testified that she was on duty in the emergency room at 1:25 p.m. October 21, 1988, when R.C. came seeking medical care. She testified that she took down a history on R.C., which included a statement that R.C. had been abducted by her estranged boyfriend at approximately 8 or 9 a.m. She testified that R.C. told her she had been slapped about the head and trunk and forced to have both oral and vaginal intercourse with her assailant. She testified that she conducted a physical exam of R.C. and found four red lesions under her right breast.

On cross-examination she testified that there was no bruising associated with the red marks and there was no bruising or bleeding elsewhere on R.C.'s body, including her face.

The judge denied defendant's motion for a directed verdict at the close of the State's case. The defendant presented no witnesses,

the parties made closing arguments and the jury was instructed, including the instruction:

"Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of defendant's consciousness of guilt. This evidence may be considered by you only for the limited purpose for which it was received." See Illinois Pattern Jury Instructions, Criminal, No. 3.14. (2d ed. 1981) (IPI).

The jury returned a verdict against the defendant on aggravated criminal sexual assault, criminal sexual assault, kidnapping and unlawful restraint. We note that the jury forms say the charges were one of aggravated criminal sexual assault and one of criminal sexual assault, but the mittimus identifies both of these convictions as aggravated criminal sexual assault. The defendant was sentenced to six years in prison to run concurrently on two charges of aggravated criminal sexual assault and one charge of kidnapping.

On the same day, defendant was sentenced to six years in prison after waiving a jury trial and pleading guilty to one count of aggravated criminal sexual assault from a second indictment stemming from an assault on R.C. November 18, 1988. The judge stated that the sentence would be served consecutive to the earlier sentence on the three-count jury conviction.

Initially we consider whether the trial court committed reversible error in permitting the State, on direct examination, to elicit an unprecedented amount of detail concerning the background and life situation of the complainant to improperly bolster her testimony and play on the sympathies of the jury, in a case where complainant's testimony may not have been true and she had a motive to testify falsely.

Defendant notes that he is not contesting the sufficiency of the evidence against defendant as a matter of law. However, defendant argues that the State used the direct examination of R.C. to elicit an unprecedented amount of background information about her in order to appeal to the sympathies of the jury and therefore improperly bolster her weak testimony.

Defendant identifies several weaknesses he perceives in R.C.'s testimony, including: whether she was taken through the front or back door at the townhouse; whether defendant ripped her clothes off or pulled her clothes off; why she would ride in a car with defendant and go to breakfast with him three weeks after the assault; why she never screamed or tried to get away; her motivation

to lie because she was angry that defendant had not paid the rent; the fact that they had prior fights and that he had begged her to return home; and the fact that they had sexual intercourse on prior occasions. Defendant contends that these facts establish that an unanswered question exists as to "whether this was a true case of aggravated criminal sexual assault or not."

Defendant argues that to offset these trouble spots in R.C.'s testimony, the State elicited information about R.C.'s previous work experience, her work as a volunteer fire fighter and the fact that she was the sole support for her three sons.

Defendant argues that in the same way it is improper to elicit testimony of a defendant's "bad character" (*People v. Liapis* (1972), 3 Ill. App. 3d 864, 868, 279 N.E.2d 368), it is equally improper to elicit evidence of a witness's "good character."

Defendant contends that in the absence of an attack upon the credibility of a witness, no evidence supporting her credibility should be allowed. (E. Cleary, McCormick on Evidence §115 (3d ed. 1984).) And if a witness' credibility is at issue, specific instances of conduct are inadmissible to support the witness' reputation. M. Graham, Cleary & Graham's Handbook of Illinois Evidence §608.1, at 366 (5th ed. 1990).

Defendant argues that the biographical testimony from R.C. also was inadmissible because it was not relevant. Evidence is only relevant, and therefore admissible (*People ex rel. Noren v. Dempsey* (1957), 10 Ill. 2d 288, 293, 139 N.E.2d 780), if it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence. *People v. Monroe* (1977), 66 Ill. 2d 317, 321-22, 362 N.E.2d 295; *Marut v. Costello* (1966), 34 Ill. 2d 125, 128, 214 N.E.2d 768.

Defendant argues that the law prohibits evidence which has the effect of appealing to the jury's sympathies or biases. (*People v. Bernette* (1964), 30 Ill. 2d 359, 371, 197 N.E.2d 436.) Defendant contends that such information elicited during direct examination and repeated at closing arguments influenced the jury with biased and prejudicial testimony by playing on the sympathies of the jury. *People v. Jackymiak* (1943), 381 Ill. 528, 536-37, 46 N.E.2d 50.

The State argues that evidence elicited through R.C.'s testimony was relevant because R.C.'s work history impressed upon the jury that R.C. had been employed consistently and her employment must be important because she is the sole support of her children. The State contends that this evidence tended to dispel the defend-

ant's contention that R.C. could have left her place of work willingly on a workday.

The State argues that testimony concerning R.C.'s children was relevant to explain why she would have gone to breakfast with the defendant on November 13.

The State contends that it is not uncommon for an attorney to ask background questions of witnesses to set them at ease. The State contends that even if it was error to elicit the information the error was harmless because the evidence against defendant was overwhelming.

Finally, the State contends that even if the prosecutor's comment in her closing argument was improper (the mention of the victim's work as a volunteer fire fighter), this alleged misconduct of counsel does not afford a basis for reversal unless it appears that the act complained of served to influence the jury in a manner that resulted in substantial prejudice to the accused. *People v. Stahl* (1962), 26 Ill. 2d 403, 405, 186 N.E.2d 349.

At trial the State contended the testimony should be admitted to provide general "background information for the individual. To show what type of an individual [she was]."

In reply, defendant argues that the State produces no authority to support its position, raised for the first time on appeal, that attorneys commonly ask such background questions, R.C.'s employment was important because she was the sole support for her children and the information about her children was relevant to establish why she was not so fearful in allowing the defendant to ride with her to breakfast November 13, 1988.

■ We disagree with defendant's contention that the background information elicited by the State was "unprecedented" and prejudicial. The jury is entitled to have information that will aid it in understanding the case. Even if the State did not articulate its trial strategy and reasoning to the defendant, the State was entitled to elicit information that would help the jury understand who was in the car and in the restaurant with R.C. when she was confronted by the defendant and why R.C. might not have willingly left her place of employment the morning of the assault.

The prosecutor did not dwell on the background information of R.C. save the mention in closing arguments about her past work as a volunteer fire fighter. We disagree with defendant's contention that R.C.'s credibility was fatally damaged by her failure to resist or try to escape. R.C. and the defendant knew each other, and she testified that she had mistakenly "trusted him."

Even if the testimony of her background was admitted in error, it did not rise to the level of error prejudicial to defendant's case. The information about R.C. was innocuous and did not affect the outcome of the trial. We find that the trial court did not err in the latitude it provided the prosecutor on direct examination of R.C.

Finally we consider defendant's contention that the trial court erred in instructing the jury that "evidence has been received that defendant has been involved in offenses other than that charged," because the evidence if believed showed only one other offense (alleged intimidation of the victim) rather than multiple "offenses." He contends further that a reasonable juror could read the instruction as assuming that defendant committed the other offense or offenses, whereas whether the offense(s) occurred was a contested issue for the jury to determine.

Among the instructions given to the jury was:

> "Evidence has been received that the defendant has been involved in offenses other than that charged in the indictment. This evidence has been received solely on the issue of defendant's consciousness of guilt. This evidence may be considered by you only for the limited purpose for which it was received."

Defendant contends that this instruction was given in error and prejudiced the jury by: (1) informing jurors there was more than one offense involved, and (2) by making the factual assumption that "offenses" had occurred. Defendant contends that at trial the jury heard evidence of only one other alleged offense and argues that "it is obviously improper for a prosecutor to inform the jury of alleged other crimes by the defendant that are not introduced into evidence." *People v. Whitlow* (1982), 89 Ill. 2d 322, 340, 433 N.E.2d 629 ("It can hardly be disputed that the State inferred defendant *** committed theft. This allegation is totally unsupported by any evidence from which the inference could be derived").

Defendant contends that if R.C.'s testimony was believed by the jury, it would still constitute only one other offense because her testimony regarding November 18 involved only discussion of his concerns over her testimony in court that day about prior threats he had made to her. Defendant contends that for that reason the use of the word "offenses" was prejudicial error.

Defendant argues that the use of the plural term "offenses" by the judge himself would tend to carry great weight with the jury. *People v. Marino* (1953), 414 Ill. 445, 450-51, 111 N.E.2d 534.

Defendant cites *People v. McCauley* (1972), 2 Ill. App. 3d 734, 736, 277 N.E.2d 541, where the defendant was arrested for traffic violations. The arresting officer at trial testified that defendant, while being transported to the station, swore at him and kicked out the plastic shield between the front and back seats. The officer testified that he then stopped the car and opened the back door to put handcuffs on the defendant, but the defendant struck him in the face. Contradictory testimony from defendant and a friend of his was that the officer was the aggressor. *McCauley*, 2 Ill. App. 3d at 735-36.

In *McCauley*, the jury was instructed that a police officer is justified in using reasonably necessary force to prevent the escape of an arrested person or defend himself while preventing an escape. The jury was also instructed that a person is not authorized to use force to resist an arrest under any circumstances.

On appeal the *McCauley* court found reversible error in the instructions, noting that the defendant was not charged with resisting arrest or attempted escape. The appellate court stated: "The law is clear that the jury can be instructed only concerning the crime charged [citation]. The natural result of instructions based upon other crimes is prejudice to the defendant [citations]. It is reversible error to inject into the case, by way of instruction, issues which are not properly before the jury." *McCauley*, 2 Ill. App. 3d at 736.

Defendant argues that the test for determining whether the giving of an instruction such as that challenged here was error was set out in *Sandstrom v. Montana* (1979), 442 U.S. 510, 61 L. Ed. 2d 39, 99 S. Ct. 2450, where the court stated that a reviewing court should look to "the way in which a reasonable juror could have interpreted the instruction." (*Sandstrom*, 442 U.S. at 514, 61 L. Ed. 2d at 45, 99 S. Ct. at 2454.) Defendant contends that a reasonable juror would have concluded that the instruction advised him that defendant had, in fact, committed other crimes.

Defendant argues that the instruction was error because it also should have informed the jury that it had to decide whether R.C.'s testimony was true with regard to defendant committing other crimes. Defendant cites in support *People v. Lucas* (1968), 41 Ill. 2d 370, 376, 243 N.E.2d 228 (instructions must not assume the existence of any material facts in issue), *People v. O'Connor* (1920), 295 Ill. 198, 202, 129 N.E. 157 (when giving instructions, it is error to assume the truth of controverted facts), and *People v. Gathings* (1981), 99 Ill. App. 3d 1135, 425 N.E.2d 1313 (court has a duty to

properly instruct when clarification is requested) and contends the alleged threat was a contested issue at trial.

We note, however, that *Gathings* involved an IPI instruction that was "amended" before being given to the jury. (*Gathings*, 99 Ill. App. 3d at 1136.) The court stated that unless it is determined that there is no IPI instruction which accurately states the law, the appropriate IPI instruction should be given. *Gathings*, 99 Ill. App. 3d at 1138.

Defendant concedes that the instruction given was from the widely used Illinois Pattern Jury Instructions. Defendant argues, however, that IPI instructions should be modified to fit the facts of a case.

Defendant contends that evidence of the magnitude of the trial court's error can be quantified by considering an out-of-court comment by a juror after trial. At a post-trial motion hearing, defense counsel informed the trial judge that a juror told him in the hallway after trial (quoting defense counsel before the court): "that she knew that he was guilty of another crime. He did not take the stand. And that when the State brought out the November 18th incident, they knew he had committed another crime."

The State contends that the jury instruction was proper because (1) it included a directive to the jury to consider this evidence only for the limited purpose of determining defendant's consciousness of guilt, (2) more than one offense was alleged, and (3) the latter alleged offenses were directed against the same complainant.

The State contends that any attempted intimidation of a witness is properly attributable to a consciousness of guilt and is therefore admissible. (*People v. Gambony* (1948), 402 Ill. 74, 80, 83 N.E.2d 321.) If a defendant allegedly commits another crime against the same person, evidence of that crime should be admissible to show the relationship between the two parties. *People v. Richardson* (1959), 17 Ill. 2d 253, 259, 161 N.E.2d 268.

The State contends that the *McCauley* case on which defendant relies is distinguishable because the instruction given in *McCauley* included references to resisting arrest and preventing escape although the testimony in that case established that the defendant was already under arrest and no evidence suggested he tried to flee. The State contends that here, evidence of the November 18 threat and kidnapping was admitted for the limited purpose of determining the defendant's consciousness of guilt of the October 21 assault.

The State contends that the trial judge was correct in choosing the word "offenses" instead of "offense" because R.C.'s testimony regarding the November 18 incident revealed two other crimes, intimidation of a witness and kidnapping. The State rejects defendant's contention that the jury should have been instructed to make a specific finding of guilt or innocence on the other "offenses," noting that they were only admitted into evidence as evidence of consciousness of guilt.

Finally, the State rejects defendant's contention that a comment made by a juror in the hallway should be given any weight by the reviewing court. The State argues that an offhand comment as recalled by defense counsel is not necessarily indicative of how a jury reached its result. We conclude defense counsel's representation with respect to the comment was hearsay and clearly inadmissible for purposes of review.

Defendant distinguishes *Richardson* relied on by the State by noting that the limiting instruction in *Richardson* dealt with the "relationship of the parties" and not with the "consciousness of guilt." Defendant also denies that R.C.'s testimony evidenced other "offenses" by defendant on November 18. Defendant contends that R.C. testified that she was pushed into her car and defendant discussed previous threats he made to her. Defendant argues that this does not prove she was kidnapped so as to merit an instruction with the word "offenses" instead of "offense." Defendant contends that even if the jury believed defendant kidnapped R.C. on November 18, it would not be evidence that would establish "consciousness of guilt" because under *Gambony*, consciousness of guilt is established through acts designed to suppress evidence or prevent someone from testifying. (*Gambony*, 402 Ill. at 80.) Defendant argues that "by itself, an alleged act of kidnapping does not fall within this category of conduct."

■ The record establishes that R.C.'s testimony regarding the November 18 incident was objected to, in part, by defense counsel although the basis of the objection was not stated. The trial judge overruled defense objections and R.C. was permitted to testify about the incident, explaining that she was abducted by defendant as she went to pick her children up from the library. The State and defendant concede that there was properly admitted evidence of a threat made by defendant ("You told the judge these threats that I made to you"). The State contends that the testimony also evidenced kidnapping on November 18 in that R.C. testified the defendant forced her into her own car and then "He pushed himself

in the driver's seat and locked the door and started the car and then he said, 'We're going to Wisconsin.' "

We believe the jury had enough evidence before it to merit an instruction using the word "offenses." Even if defendant's action did not constitute kidnapping, clearly his conduct falls within the definition of unlawful restraint.

Likewise, we disagree with defendant's contention that the trial judge was required to modify the IPI instruction to direct the jury that it must determine whether defendant committed the other offenses. The State properly argues that the evidence was admitted only for the purpose of establishing defendant's consciousness of guilt. We find the trial court properly instructed the jury.

For the foregoing reasons, we affirm defendant's conviction and sentencing.

Judgment affirmed.

McNAMARA and RAKOWSKI, JJ., concur.