(No. 34453.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JAMES DUKES, otherwise known as Jesse Welch, Plaintiff in Error.

*Opinion filed November 20, 1957.*

336

DAILY and HOUSE, JJ., dissenting.

CHARLES A. BELLOWS, and JASON ERNEST BELLOWS, both of Chicago, for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, BRUCE E. KAUFMAN, L. LOUIS KARTON, and ROBERT W. SCHERMAN, of counsel,) for the People.

Mr. CHIEF JUSTICE DAVIS delivered the opinion of the court:

James Dukes was indicted by the grand jury of Cook County for the murder of John Blyth, a Chicago police

officer. A jury in the criminal court returned a verdict of guilty and fixed his punishment at death. Post-trial motions were overruled and sentence was imposed in accordance with the verdict. Defendant prosecutes this writ of error contending that the evidence does not establish his guilt beyond a reasonable doubt; that defendant was deprived of a fair and impartial trial by prejudicial and inflammatory argument of the State's Attorney; that the trial court erred in limiting the cross-examination of certain witnesses for the People, in admitting incompetent testimony, in improperly instructing the jury, and in refusing to declare a mistrial when, after eight jurors had been selected and allowed to separate for the night, a newspaper article prejudicial to defendant was published.

Ten witnesses testified for the prosecution. The defendant neither testified nor called any witnesses on his behalf. The evidence established the facts and sequence of events here related. The New Mount Calvary Missionary Baptist Church is situated at the southwest corner of the intersection of West Forty-seventh Street and South Wells Street in the city of Chicago. Wentworth Avenue is the next street east of Wells. An alley, parallel to Forty-seventh street, is located just south of the church property and runs in an easterly direction from the east side of Wells Street to an alley which runs north and south between Wells and Wentworth. On the evening of June 15, 1956, the Rev. Jesse James Butcher, pastor of the church, and several of his parishioners, including Thomas Sylvester and Charles Liggons, were decorating the church, and at about 12:20 A.M. they heard a woman screaming and went outside to investigate the incident. There they saw a man, identified as James Dukes, beating a woman. Sylvester asked him to move away as they were disturbing the church. The man refused, stating that the woman was his wife. Sylvester replied that he had no interest in their domestic affairs and again requested that they move on, whereupon the man

shouted an obscene oath and produced a pistol, shot Sylvester in the left shoulder and then fired two more shots, one of which struck Liggons in the leg. After the shooting the man led the woman toward the alley which runs east from Wells Street, and Reverend Butcher entered the church to call the police.

Meanwhile, plainclothes officers John Blyth and Daniel Rolewicz, who had been patrolling the neighborhood in an automobile, heard the shots. They parked their car at Forty-seventh Street and Wentworth Avenue and walked west on Forty-seventh Street toward Wells Street, Blyth on the south side of the street and Rolewicz on the north side. Rolewicz was about 50 feet ahead of Blyth, and as he reached the building at 216 Forty-seventh Street, he saw a man, identified as Dukes, run north across the street to a point just ahead of him. Rolewicz shouted, "police officer" and asked, "What do you have there?" Without reply the man drew a gun from under his vest and fired two close range shots at Rolewicz, and then fled south across Forty-seventh Street. Though uninjured, Rolewicz fell to the sidewalk as the shots were fired and from this prone position fired twice as the man fled south and west toward Wells Street. Rolewicz then ran to the corner of Forty-seventh and Wells, and as he turned and looked south he saw officer John Blyth at the entrance of the alley on the east side of Wells Street after which he heard a shot and saw him fall. A man, identified as Dukes, then ran out of the alley and south on Wells Street. Rolewicz ran after him, firing the four remaining shots in his gun, but the man disappeared into a gangway.

Reverend Butcher testified that while he was in the church calling the police he heard more shots being fired and that as he came out of a Wells Street entrance to the church, he saw a man, identified as Dukes, running south on the east side of Wells Street with officer Blyth in pursuit about 50 feet behind; that they exchanged several shots

and the man ran into the alley; that Blyth ran to the south edge of the alley and then turned as though to enter; that the witness then saw a flash from a gun at a point on the north side of the alley near a telephone pole located approximately six feet from the entrance and then saw Blyth fall; and that he saw Rolewicz pursue the man south on Wells Street.

Rolewicz returned and found Blyth mortally wounded. Other officers arrived shortly afterward and searched the area. After following a trail of blood they found Dukes under a parked station wagon in a vacant lot at 4804 South Wentworth Avenue, approximately a block and one half from where Blyth was shot. The officers recovered from his person an empty foreign-make automatic pistol. He was found to be bleeding from a wound in his right shoulder and was taken to the Bridewell Hospital.

A coroner's physician testified that Blyth died from multiple extreme injuries of the left chest caused by a gunshot wound from a bullet which entered his body at the second left intercostal space, the pellet fracturing the left second rib and emerging at the upper border of the left scapula.

From the evidence in this case, we conclude that the jury was justified in returning a verdict of guilty and that the death penalty may well have been warranted. But our review cannot end with that observation. We must determine whether prejudicial errors were committed during the trial which deprived the defendant of those constitutional safeguards which, under our laws, are afforded to the guilty as well as the innocent. Where the charge is murder, a jury has wide discretion in fixing the punishment. (Ill. Rev. Stat. 1955, chap. 38, pars. 360 and 801.) And when, in the exercise of that discretion it inflicts the death penalty, this court cannot affirm that judgment even though proof of guilt is clear, if prejudicial error occurred in the trial. *People* v. *Crump,* 5 Ill.2d 251; *People* v. *Jackymiak,* 381

Ill. 528; *People* v. *Winchester,* 352 Ill. 237; *People* v. *King,* 276 Ill. 138.

At the trial, John Blyth, Jr., 18 years of age, testified that he was a son of the deceased and that he lived with his mother, two sisters and a brother. Defense counsel objected to this testimony but his objections were overruled. This court, in murder cases, has frequently condemned the admission of evidence that deceased left a spouse and a family. (*People* v. *Jackymiak,* 381 Ill. 528; *People* v. *Gormach,* 302 Ill. 332; *People* v. *McMahon,* 244 Ill. 45; *Filippo* v. *People,* 224 Ill. 212.) Such evidence has no relation to the guilt or innocence of the accused or the punishment to be administered to him, and is ordinarily calculated only to prejudice the defendant with the jury. Where it is not elicited incidentally, but is presented in such manner as to cause the jury to understand that it is a matter material and proper to be proved, its admission is prejudicial error. (*Filippo* v. *People,* 224 Ill. 212.) Counsel for the People argue that this testimony was brought to the notice of the jury only incidentally. We cannot agree. It appears that the prosecutor regarded the questioned evidence as material and proper in that he urged the death penalty for the defendant in his closing argument to the jury, "because of the family he has destroyed." We must assume that the jury considered it as material, since the court overruled objections to both the evidence and the argument. Its only purpose was to prejudice the defendant in the eyes of the jury and to arouse in them anger, hate and passion. We cannot speculate as to the extent to which the jury was influenced by this incompetent evidence and inflammatory argument.

Defense counsel contend that the prosecutor wept during the closing argument when he said, "* * * and I am not ashamed of what I am doing now, believe me. I knew the dead man." Counsel for the People point out that the record, as abstracted, does not indicate such fact, but it is

significant that when this point was argued on motion for new trial, the prosecutor did not deny that he wept, stated that he may have, but he did not recall. If we assume that the prosecutor knew the deceased and was personally grieved over his death, facts not of record, even then if he wept before the jury, both his conduct and argument were highly improper and prejudicial. However, the effect of such conduct and argument, upon the right of the defendant to a fair and impartial trial, was equally prejudicial and damaging whether the motives by which the prosecutor was actuated were culpable or innocent.

The record in the case at bar was silent concerning the qualities and character of the deceased. It is especially improper, in addressing the jury in a murder case, for the prosecuting attorney to make reference to his knowledge of the good qualities of the deceased where there is no evidence in the record bearing upon his character. (26 Am. Jur. sec. 492, page 499.) Yet the prosecutor in argument, on more than one occasion, extolled the virtues of the deceased. Repeated objections to this line of argument were overruled. A prosecutor should never inject into his argument evidence not introduced at the trial. *People* v. *Weitzman*, 362 Ill. 11.

At another point in the argument the prosecutor said: "He, (referring to the arresting officer,) undoubtedly figured that he would leave it to the courts; he would leave it to twelve people like yourselves, to have the courage and guts to do your duty. So, for that reason, this man is here today." By this argument, the prosecutor insinuated that the arresting officer had the right to take the defendant's life but spared it because he believed the jury would impose the death penalty. It seems unnecessary for us to say that this statement should not have been made, and that the court further erred in overruling the objection to this argument. The police officer, having apprehended the defendant without resistance, had no right to take his life and it was

highly improper to tell the jury that the fact that his life had been spared was to be taken into consideration by them in fixing the penalty in this case.

Though there was no evidence that the defendant had ever used any name other than James Dukes, the attorney for the People, in his opening statement and final argument to the jury, repeatedly referred to the alias, "Jesse Welch," which appeared on the face of the indictment. In the opening part of his final argument he told the jury that the grand jury was a group of intelligent people; that they had put the alias "Jesse Welch" in the indictment for a good reason and not because they had picked it out of the air. Then, replying to the defense statement that the record did not show that the defendant had been in trouble before in his 30 years of life, the prosecutor said: "There is no evidence that he has had a good background for 30 years, so do not be fooled by it, keeping in mind with respect to James Dukes, alias Jesse Welch, that people use different names for different reasons." This suggestion that the defendant had reason to conceal his identity by the use of an alias, which indicated a prior record of crime, was improper and prejudicial. The People contend that the entire argument was justified as a reply to statements made by defense counsel. It was proper for the prosecution to answer that there was no evidence that defendant had a good background of 30 years, but the statement concerning the alias was entirely unwarranted. It was not based upon any evidence in the case, nor can it be deemed a legitimate statement by way of answer to the defense argument. In a sense it was more damaging than proof of other specific criminal offenses because it left the jury to speculate upon the insinuation that the defendant had a prior record without stating what it was. It is improper for the prosecutor to do or say anything in argument the only effect of which will be to inflame the passion or arouse the prejudice of the jury against the defendant without throwing any light

on the question for decision. (*People* v. *Galloway*, 7 Ill.2d 527; *People* v. *Jackymiak*, 381 Ill. 528.) The objections of defense counsel to statements concerning the alias should have been sustained and the trial court's failure to do so was prejudicial error.

Defense counsel contend that the trial court erred in limiting the cross-examination of certain witnesses for the People. We have carefully examined the record and it does not appear to us that the rights of the defendant were seriously prejudiced in this respect. The latitude allowed on cross-examination of a witness in a criminal proceeding rests in the court's sound discretion, and its rulings in this respect will not be disturbed in the absence of a clear abuse of such discretion. *People* v. *Moretti*, 6 Ill.2d 494; *People* v. *Provo*, 409 Ill. 63.

The defendant urged that the trial court erred in giving People's instructions concerning flight and malice. The jury was instructed that the fact of flight was a circumstance to be considered with all the other evidence in the case as tending to prove guilt. The instruction was based upon the evidence in the case and was entirely proper. (*People* v. *Schaffner*, 382 Ill. 266.) The defendant complains that the court gave too many instructions on the subject of malice. Four were given which defined murder in terms of the statute, express malice, implied malice, and the circumstances under which malice may be presumed. There was no error in the giving of these instructions. They were not four instructions on the same subject as defendant contends, but different instructions covering various aspects of the element of malice in the crime of murder.

The contention that the court erred in refusing to declare a mistrial due to the publication of a prejudicial newspaper article is not fairly presented for our review because neither the article itself, nor proof that any of the jurors read it, is included in the record. In cases where this question is raised the most controlling fact or circumstance is the char-

acter and nature of the article. (*People* v. *Hryciuk,* 5 Ill.2d 176.) In any case, before it can be said that the jurors have been influenced and prejudiced by the article to the extent that they cannot be fair and impartial, facts and circumstances must appear from which it is reasonable to infer that the jurors, or at least some of them, have read the newspaper accounts. *People* v. *Gambino,* 12 Ill.2d 29; *People* v. *Murawski,* 394 Ill. 236; *People* v. *Rogers,* 303 Ill. 578.

Because of the admission of incompetent evidence and of the inflammatory and prejudicial argument of the prosecutor, we are compelled to reverse the judgment and order a new trial. Where the jury fixes the penalty, as in a death case, error of this character assumes increased importance. (*People* v. *Crump,* 5 Ill.2d 251.) The record in this case clearly shows that the death penalty imposed upon the defendant did not result from a trial free of substantial prejudicial error.

*Reversed and remanded.*

DAILY and HOUSE, JJ, dissenting.