(No. 52354.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERTO E. RAMIREZ, Appellant.

*Opinion filed November 10, 1983.*

442

SIMON, J., specially concurring.

James J. Doherty, Public Defender, of Chicago (Robert P. Isaacson, Ira Churgin, and Aaron L. Meyers, Assistant Public Defenders, of counsel, and John J. Walsh, law student), for appellant.

Tyrone C. Fahner, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Michael B. Weinstein, Assistant Attorney General, of Chicago, and Michael E. Shabat and J. Marck Lubanich, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

The defendant, Roberto E. Ramirez, 51 years of age, was found guilty of murder and attempted armed robbery following a bench trial in the circuit court of Cook County. The defendant was not sentenced on the attempted-armed-robbery conviction but, pursuant to the discretion granted it by the Illinois death penalty statute, the prosecution requested a death penalty hearing on the defendant's murder conviction. (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(d).) The defendant exercised his right to a bifurcated jury sentencing hearing. The jury found, in stage one of the bifurcated hearing, that the defendant was over 18 years old and that a statutory aggravating factor existed: that the deceased was "killed in the course of another felony." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6).) In stage two, the jury found that

there were "no mitigating factors sufficient to preclude the imposition of the death sentence" and signed the verdict form for the sentence of death. Ill. Rev. Stat. 1977, ch. 38, par. 9—1(g).

On May 30, 1979, the trial court entered judgment on the jury's verdict and scheduled defendant's execution for August 12, 1979. Defendant's sentence was automatically stayed pending disposition of the appeal by this court pursuant to Supreme Court Rules 603 and 606. 87 Ill. 2d Rules 603, 606.

On September 7, 1977, the defendant entered the First National Bank of Lincolnwood armed with a .38-caliber pistol. The defendant approached James Koumoundouros, an off-duty Chicago policeman who was working as an armed security guard at the bank. The defendant instructed the guard to put his gun down. Koumoundouros began to rise from the desk he was sitting behind while slowly taking his pistol out of its holster with his left hand. He also reached under the desk with his right hand and activated an alarm button which alerted the local police station and set hidden bank cameras in motion. Three gunshots were fired, one from the gun of Koumoundouros and two from the gun of the defendant. The defendant was shot in the thigh, and Koumoundouros suffered a fatal wound to his neck. The two bank cameras photographed the entire incident, each camera taking two pictures per second.

After the shooting, the defendant ran from the bank and jumped into his car, which he had left in the bank parking lot. The defendant had taped license plates which were not registered to him over his own plates. After circling the parking lot twice, apparently to determine if a police car nearby was following him, the defendant fled the scene. While being chased in his car, the defendant crashed into a tree. The defendant was placed under arrest at that time.

At trial, the defendant pleaded insanity. The basic theory of his defense was that due to a long history of alcoholism and heroin addiction, he suffered from alcohol psychosis and organic brain damage which rendered him legally insane at the time of the offense. The trial judge rejected the defendant's theory and found him guilty of murder and attempted armed robbery.

During stage one of the sentencing hearing, the prosecution presented evidence of the September 7, 1977, bank robbery during which the deceased was shot. The prosecution also introduced evidence of an August 6, 1977, bank robbery of the same bank which was also committed by the defendant. The August 6, 1977, bank robbery was also filmed by the two hidden bank cameras. Frances Huritz, a senior vice-president and branch manager of the bank, testified that the defendant was the same man who had robbed the bank on August 6, 1977. Portions of the defendant's trial testimony were introduced by the prosecution at stage one of the sentencing hearing over the objection of defense counsel. At the conclusion of stage one, the jury returned its verdict finding that the defendant was over 18 years of age at the time of the offense and that the statutory aggravating factor of "in the course of another felony" existed, making the defendant eligible for the death penalty.

Stage two of the sentencing hearing consisted of evidence in aggravation and mitigation. The defense relied on two factors which it introduced in mitigation. First, defendant contended that his chronic alcoholism and heroin addiction created an extreme mental and emotional disturbance and, second, that he only shot the deceased after he was shot himself. In aggravation, the State introduced evidence of the defendant's 14 prior convictions and introduced testimony relating to several other offenses. The State also argued that the deceased had not fired the first shot, but even if he had, it did not matter.

In stage two, the jury returned a verdict finding that there were "no mitigating factors sufficient to preclude the imposition of the death sentence."

On appeal before this court, the defendant raises 30 issues. None of the issues the defendant raises relate to his convictions for attempted armed robbery and murder. The first 23 issues relate to alleged errors which the defendant asserts were made during the sentencing hearing and which, he argues, require reversal of his sentence. Seven issues involve challenges to the constitutionality of the Illinois death penalty statute (Ill. Rev. Stat. 1977, ch. 38, par. 9—1). Defendant concedes in his reply brief that several of these issues have already been rejected by this court. We have examined all seven issues and find that they have all been previously decided adversely to defendant.

### THE DEFENDANT'S FIFTH AMENDMENT RIGHT TO REMAIN SILENT

The first issue the defendant raises in this appeal concerns the trial judge's refusal to instruct the sentencing jury during stages one and two of the sentencing hearing that it was not to consider the defendant's decision not to testify in reaching a verdict. The defendant asserts that the judge's refusal to so instruct the jury, and the prosecutor's comments during closing argument in stages one and two regarding the defendant's decision not to testify, violated his constitutional privilege against self-incrimination and require reversal of his death sentence.

The State maintains that the trial court properly refused to give the defendant's proffered jury instruction because the defendant had voluntarily testified at trial, waiving his privilege against self-incrimination at the sentencing hearing. Also, the State asserts that the effect of the instructions that were given, taken as a

whole, clearly imparted to the jurors the fact that the defendant was not required to testify and that his silence could not be considered by them in reaching their decision. The judge had instructed the jury: "The burden is on the State to establish the existence of the statutory aggravating factors beyond a reasonable doubt. The defendant is not required to prove that the prosecution has failed to establish the existence of the statutory aggravating factors; and the defendant is not required to testify." The defendant contends that telling the jury that he was not required to testify falls far short of telling the jury that they could not consider his silence in any way in arriving at their decision.

It is clear that the fifth amendment privilege against self-incrimination extends to the sentencing hearing phase of a defendant's capital murder trial. In *Estelle v. Smith* (1981), 451 U.S. 454, 68 L. Ed. 2d 359, 101 S. Ct. 1866, the United States Supreme Court held:

"We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned. Given the gravity of the decision to be made at the penalty phase, the State is not relieved of the obligation to observe fundamental constitutional guarantees. See *Green v. Georgia* [(1979), 442 U.S. 95, 97, 60 L. Ed. 2d 738, 741, 99 S. Ct. 2150, 2151-52]; *Presnell v. Georgia* [(1978), 439 U.S. 14, 16, 58 L. Ed. 2d 207, 211, 99 S. Ct. 235, 236-37]; *Gardner v. Florida* [(1977), 430 U.S. 349, 357-58, 51 L. Ed. 2d 393, 401-02, 97 S. Ct. 1197, 1204] (plurality opinion)." *Estelle v. Smith* (1981), 451 U.S. 454, 462-63, 68 L. Ed. 2d 359, 369, 101 S. Ct. 1866, 1873.

Because the defendant in the instant case testified at the guilt-innocence phase of the trial does not mean that he has waived his fifth amendment privilege to remain silent at the sentencing phase of this trial. (*People v. Walker* (1963), 28 Ill. 2d 585; *People v. Williams* (1962), 25 Ill. 2d 562; *United States v. Trejo-Zambrano* (9th Cir. 1978), 582

F.2d 460.) Whether the evidence which he gave at the trial was properly admitted at the sentencing hearing will be discussed later in this opinion, but we do believe that the defendant had the right to remain silent at the sentencing hearing and that his silence could not be used against him.

Since the defendant had the right to remain silent and he exercised that right at the sentencing hearing, he cannot be penalized for exercising that right. See *Malloy v. Hogan* (1964), 378 U.S. 1, 8, 12 L. Ed. 2d 653, 659, 84 S. Ct. 1489, 1493-94.

During the sentencing hearing the defendant tendered a jury instruction based on his constitutional right to remain silent. The instruction read:

> "The fact that the defendant did not testify [at the hearing] should not be considered by you in any way in arriving at your decision." (Illinois Pattern Jury Instruction, Criminal, No. 2.04 (1968).)

The trial judge refused to give the defendant's tendered instruction and instead informed the jury that the burden of proof was on the State and that "[t]he defendant [was] not required to prove that the prosecution [had] failed to establish the existence of the statutory aggravating factors; and the defendant is not required to testify."

In *Carter v. Kentucky* (1981), 450 U.S. 288, 67 L. Ed. 2d 241, 101 S. Ct. 1112, the United States Supreme Court dealt with a situation very similar to the one in the instant case. In *Carter,* the defendant chose not to testify at his trial. Defense counsel requested that the following instruction be given to the jury:

> " 'The [defendant] is not compelled to testify and the fact that he does not cannot be used as an inference of guilt and should not prejudice him in any way.' " (450 U.S. 288, 294, 67 L. Ed. 2d 241, 246, 101 S. Ct. 1112, 1116.)

The trial court refused to instruct the jury as requested. The State, in that case, argued that the jurors knew they could not draw an adverse inference from the defendant's election to remain silent because they were instructed to

determine guilt "from the evidence alone," and because failure to testify is not "evidence." The Supreme Court held: "Jurors are not lawyers; they do not know the technical meaning of 'evidence.' They can be expected to notice a defendant's failure to testify, and, without limiting instruction, to speculate about incriminating inferences from a defendant's silence." (450 U.S. 288, 303-04, 67 L. Ed. 2d 241, 253, 101 S. Ct. 1112, 1121.) The court further held: "Just as adverse comment on a defendant's silence 'cuts down on the privilege by making its assertion costly,' *Griffin* [*v. California* (1965), 380 U.S. 609, 614, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, 1233], the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege. Accordingly, we hold that a state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." (450 U.S. 288, 305, 67 L. Ed. 2d 241, 254, 101 S. Ct. 1112, 1121-22.) In the instant case the trial judge's refusal to instruct the jury that they were not to consider the defendant's silence constituted reversible error.

In addition to the trial judge's refusal to give the defendant's proposed jury instruction, the prosecutor made several comments in his closing arguments at both stages one and two regarding the defendant's silence. This court has addressed the issue of whether certain remarks made by the prosecution concerning a defendant's silence in other cases constitutes reversible error. In *People v. Hopkins* (1972), 52 Ill. 2d 1, the prosecution, in its closing arguments, referred seven times to the fact that the testimony of the prosecution witness was "uncontradicted." This court held:

"Both by statute (Ill. Rev. Stat. 1965, ch. 38, par. 155—1), and by the Federal constitution (see *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct.

1229), the court and the prosecutor are forbidden from making any direct reference to a defendant's failure to testify. *People v. Burton* (1969), 44 Ill. 2d 53.

The prosecution may, however, refer to the fact that the testimony of the State's witnesses is uncontradicted even though the defendant would be the only person who could have contradicted it (*People v. Mills* (1968), 40 Ill. 2d 4, 8-9; *People v. Norman* (1963), 28 Ill. 2d 77, 81), for this involves no more than an accurate summary of the evidence. But the prosecution may not accomplish indirectly what it could not do directly. That the line is not easy to draw is apparent from the fact that the test is often stated in subjective terms—whether 'the reference [was] intended or calculated to direct the attention of the jury to the defendant's neglect to avail himself of his legal right to testify.' *Watt v. People* (1888), 126 Ill. 9, 32; *People v. Mills* (1968), 40 Ill. 2d 4, 8." 52 Ill. 2d 1, 6.

In the instant case, the prosecutor did not only remark that "[t]he evidence that we have presented in this case is overwhelming, uncontradicted, undenied, unrebutted." The prosecutor also stated, "He [the defendant] has sat silent before you, before his accusers and before the tryer [*sic*] of fact and offered no explanation for the murder." We agree with the defendant that the comment made by the prosecutor was highly prejudicial and constitutes reversible error. The State's argument that the prosecutor's comment was not directed at the defendant's failure to testify but, rather, was directed only at the defendant's lack of remorse and, therefore, permissible, is without merit. It is clear that the comment specifically refers to the defendant's decision to exercise his fifth amendment privilege against self-incrimination.

The trial judge's refusal to properly instruct the jury regarding the defendant's silence and the prosecutor's comments were improper and constitute reversible error because they clearly affected substantial rights of the defendant.

### THE PROSECUTOR'S CALLING THE DECEASED'S WIDOW TO THE WITNESS STAND

At stage one of the sentencing hearing, the prosecution called Karen Koumoundouros, the widow of the deceased, to the witness stand. The widow was sworn and gave the following testimony:

"Q. Miss Witness, would you state your full name, please and spell your last name for the ladies and gentlemen of the jury.

A. Mrs. Karen Koumoundouros K-O-U-M-O-U-N-D-O-U-R-O-S.

Q. Mrs. Koumoundouros, on September 7, 1977, were you married?

A. Yes.

Q. To whom were you married?

A. James Koumoundouros."

At this point in the proceeding, defense counsel objected and asked for a sidebar during which he argued that there was no purpose to be served by calling the deceased's widow as a witness except to engender sympathy in the jury. Defense counsel argued that the only purpose Mrs. Koumoundouros could possibly serve would be for life and death purposes and that life and death were not at issue in the sentencing hearing.

Throughout the entire sidebar, Mrs. Koumoundouros remained on the witness stand. During the sidebar, the trial judge sustained defense counsel's objection. The prosecutor then asked to be heard in chambers. The trial judge refused the request, stating, "The objection is sustained. I don't know if she's going to make the distance." The judge's statement was made during the sidebar, outside the hearing of the jury. The court then recessed for lunch. After the jury left, the witness stepped down from the stand.

This court has dealt with the issue of the admissibility of evidence relating to a victim's family in a murder trial many times. This court has held:

"It is axiomatic that a defendant's guilt must be es-

tablished by competent evidence uninfluenced by bias and prejudice, and that therefore evidence that a murder victim has left a spouse or children is inadmissible since it does not enlighten the trier of fact as to the guilt or innocence of the defendant or as to the punishment he should receive, but only serves to prejudice and inflame the jury. Generally, the rule is that '*** where testimony in a murder case respecting the fact the deceased left a spouse and family is not elicited incidentally, but is presented in such a manner as to cause the jury to believe it is material, its admission is highly prejudicial and constitutes reversible error unless an objection thereto is sustained and the jury instructed to disregard such evidence. In like manner, we have held that jury argument by the prosecution which dwells upon the decedent's family or seeks to relate a defendant's punishment to the existence of family is inflammatory and improper.' (*People v. Bernette,* at 371.) That case also held that '*** the irrelevancy and highly prejudicial nature of such evidence is so well established, that it was the duty of the court in a murder case to have refused it on its own motion.' *Bernette* at 372." *People v. Jordan* (1967), 38 Ill. 2d 83, 91.

In the instant case it is not clear for what purpose the deceased's widow took the stand. The defense argues it was to engender sympathy. The State contends that it was for a valid purpose, but that since the trial judge sustained the defendant's objection, it was never able to set forth its purpose in calling the widow. The State does not give any reason in its brief to explain why Mrs. Koumoundouros was called to the stand. The State's brief reads, "The People will not speculate as to the motive behind calling Ms. Koumoundouros to testify but neither should defendant speculate that every action of the prosecution is designed to deprive defendant of a fair trial."

As the defendant asserts, before the sentencing hearing began the defendant had already been convicted of murder and attempted armed robbery by the trial court. The defendant's certified statement of conviction was read into the record. The only issues before the sentencing jury in

stage one, during which Mrs. Koumoundouros testified, was whether the deceased was killed in the course of another felony and whether the defendant was 18 or more at the time of the offense. Since the deceased's widow was not present during the offense, she could not offer any testimony as to whether her husband's death occurred during the course of a forcible felony. She also did not know the defendant, so she could not offer any evidence as to the defendant's age. And since the trial had established that the defendant had committed the murder of the deceased, it was not necessary for her to be called as a life/death witness.

We agree that the deceased's widow had no evidence of probative value to contribute to the establishment of the two factors the State was seeking to prove in stage one of the sentencing hearing. The State has not offered any valid purpose which was served by calling Mrs. Koumoundouros to the stand. The general rule, as we quoted previously, deals with testimony in a murder case that is elicited incidentally or evidence which is presented in such a manner as to cause the jury to believe it is material. In the instant case, the prosecutor specifically called the deceased's widow to the stand and asked her about her husband. Mrs. Koumoundouros testified that she was married to the deceased on September 7, 1977, the date of the murder. We believe that the admission of this testimony was error because, even though defense counsel's objection was sustained, the testimony was purposely presented in such a manner as to cause the jury to believe that the fact that the deceased left a widow was material to the determination of his eligibility for the death penalty.

### DECEASED'S STATUS AS A CHICAGO POLICE OFFICER

The defendant contends that the continuous reference to James Koumoundouros as a police officer during the en-

tire sentencing hearing and the prosecution's closing argument caused the sentencing jury to sentence him to death, in part, for killing a Chicago police officer. The State maintains that the defense, by failing to object to any reference to the deceased as a police officer and in light of defense counsel's repeated reference to Mr. Koumoundouros as a police officer, waived this issue on appeal. The State also contends that the fact that the deceased was a police officer was relevant because it explained the reaction of Officer Koumoundouros to the defendant's command to put his gun down. In addition, the State maintains that divulging the fact that the victim was a police officer was actually beneficial to the defendant. During *voir dire,* prospective jurors were excused because they stated that their relationships with police officers would influence their decision in the instant case. In each case, the prospective juror was either related to or friends with a police officer or law-enforcement agent, and that fact, they stated, would prevent them from being fair and impartial. If the deceased's status had not been brought to light, then the excused jurors may have remained on the jury and acted through prejudice in reaching their decision.

We agree with the State that the prosecutor did not try to prove that the defendant killed Officer Koumoundouros knowing him to be a police officer, as the defendant alleges. However, we do agree with the defendant that the prosecutor, without stating that he was trying to prove an additional aggravating factor, did prejudice the defendant in his closing argument.

One of the aggravating factors listed in the Illinois death penalty statute provides that a person convicted of murder may be sentenced to death if:

"1. the murdered individual was a peace officer or fireman killed in the course of performing his official duties and the defendant knew or should have known that the murdered individual was a peace officer or fireman; ***." Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(1).

It wasn't until the prosecutor gave his closing argument that he presented the deceased's status to the jury as if the fact that he was a police officer was material in determining the sentence which was to be imposed. In his closing argument, the prosecutor told the jury:

"I'd like to reflect upon the incident of September 7th in which a fine police officer lost his life. Now, whether you want to say he was acting in the performance of his duties as a police officer or if you want to say he was working part time to make a few extra bucks, he stood and represented the same thing.

* * *

James Koumoundouros, every moment of his life was a policeman... There is a little saying on the side of police vehicles. And it is a four word saying. And it says 'we serve and protect.' I think that you should dwell upon that as we look at the September 7th incident according to Mr. Carey. *** I mention to you those four words, 'We serve and protect.' Those words mean that police officers are willing to die to uphold the law. They are putting their lives on the line for you each day. James Koumoundouros died, not as a part-time security guard, and not for that purpose. He died serving and protecting. And it's about time, ladies and gentlemen of this jury, it is about time that we value the lives of our policemen. Value the lives of the people who protect us every day. ***

These are the tools of the life of Roberto Ramirez. This is the tool of a police officer who died upholding the law.

* * *

You must now serve and protect the people of this country. You must now fulfill your obligation to the law, to the evidence. You must serve and protect so that James Koumoundouros doesn't die for nothing...Ladies and gentlemen, you must serve and protect us all."

Whether the deceased in the instant case was a Chicago police officer was irrelevant to the determination of whether the defendant should be sentenced to death. The only reason it was irrelevant was that at the time he was

shot he was not acting in the course of his official duties as a police officer. The prosecutor's remarks were improper because they made the jurors think that the deceased's status as a police officer was a factor to be taken into account in their deciding whether to impose the death penalty.

The Illinois death penalty statute requires that aggravating and mitigating factors must be *"relevant* to the imposition of the death penalty." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) The remarks of the prosecutor in his closing argument could only be interpreted one way—that the defendant should receive a death sentence because he killed a Chicago police officer. These comments by the prosecutor were error.

### THE CONSTITUTIONALITY OF SECTION 9—1(b)(6)(a), SPECIFICALLY THE PHRASE "SIMPLY AS A CONSEQUENCE OF THE CRIME."

While the defendant argues that section 9—1(b)(6)(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(a)) is unconstitutionally vague and ambiguous in that it does not give a defendant fair notice of what conduct makes him or her eligible for the death penalty, we do not have to address this issue here because we are reversing the death penalty on other grounds.

### MURDER IN THE COURSE OF AN ATTEMPTED ARMED ROBBERY

Defendant asserts that since he was convicted of attempted armed robbery, which is not, he alleges, listed as one of the crimes for which he would be eligible for the death penalty under section 9—1(b)(6)(c) (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(c)), then he was not eligible for the death penalty.

Section 9—1(b)(6) provides in pertinent part:

"the murdered individual was killed in the course of another felony if:

* * *

(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(6)(c).

At the conclusion of stage one of the sentencing hearing, defense counsel filed a motion to bar imposition of the death penalty, arguing that defendant was not eligible because attempt was not one of the enumerated qualifying felonies. The trial judge rejected the defendant's theory and denied the motion. The judge gave the following instruction to the jury:

"When I use the words 'in the course of another felony,' I mean a person was attempting to commit or was committing another felony.

The other felony need not be completed."

The State maintains that the defendant was subject to the death penalty where he murdered an individual "in the course of" an armed robbery. The State argues that a murder perpetrated pursuant to an attempted armed robbery is necessarily committed "in the course of" an armed robbery, so that the plain, unambiguous meaning of the statute defining the applicable aggravating factor includes an attempt to commit an armed robbery.

The State asserts that *People v. Walker* (1982), 91 Ill. 2d 502, is dispositive of this issue. We agree.

In *Walker* this court dealt with the exact issue raised by the defendant. We held:

"The statute [death penalty statute] does not require that the accused be convicted of the commission of one of the listed aggravating felonies. Whether the murder is committed in association with the actual completion of the aggravating felony or only with the attempted felony is not crucial. The aggravating factor which triggers the application of the death penalty statute is that the murder be committed '*in the course of*' the aggravating felony. A murder may be committed 'in the course of' an armed robbery whether or not the actual armed robbery

is consummated." 91 Ill. 2d 502, 510.

In response to defendant's argument that if the legislature had wanted to include "attempts" in section 9—1(b)(6)(c) it would have expressly included attempts, this court held in *Walker*:

"This misconstrues the fact that the statutory aggravating factor is, as noted above, not the conviction of armed robbery or attempted armed robbery, but murder 'in the course of' armed robbery. It is true, of course, that some of the same facts may go to prove both the attempted felony and the aggravating factor because one of the elements of 'attempt' is taking a substantial step toward the commission of a crime (Ill. Rev. Stat. 1977, ch. 38, par. 8—4(a))." 91 Ill. 2d 502, 512.

### EXCLUSION OF PROSPECTIVE JUROR COMO

The defendant contends that the trial court judge acted improperly when he excused prospective juror Como for cause *sua sponte* because it was alleged that he was a good friend of the court bailiff.

Since we here determine that the defendant is entitled to a new sentencing hearing on other grounds, the issue of whether prospective juror Como was improperly excluded is moot.

### "DEATH QUALIFICATION" OF THE JURY

The defendant maintains that he was denied a fair sentencing hearing because, while the trial judge "death qualified" the jury *sua sponte,* he failed to also "life qualify" the jury. We are assuming that by this term the defendant means that a "life qualified" jury would be a jury where those who would always be in favor of the death penalty would be excluded. This failure, defendant contends, resulted in a "hanging" jury that was biased in favor of the death penalty.

The State maintains that the trial judge was under no obligation to *sua sponte* "life qualify" the jury, that defense

counsel failed to make use of the opportunity he was given to question the jury regarding any bias they had in favor of the death penalty, and that, in any event, the defendant has failed to show that the failure to "life qualify" the jury resulted in a jury biased in favor of the death penalty.

We agree with the State that defense counsel was given the opportunity to discover whether any of the prospective jurors were biased in favor of the death penalty. Counsel were encouraged to submit any questions which they wanted to be asked.

The defendant has not made any showing that any juror on his jury believed that the death penalty should be imposed in every case where a defendant is convicted of murder. As a matter of fact, all the jurors in this case stated that there was no reason why they could not be fair and impartial.

We do not agree with defendant that it was necessary for the trial judge to "life qualify" the jury. Just because the jurors were not opposed to the death penalty does not mean that they were biased in favor of it. The defendant's argument is unsupported by the record.

## OTHER CRIMES EVIDENCE

At stage two of the sentencing hearing, in addition to introducing evidence of 13 prior convictions ranging from assault and battery to bank robbery, the prosecution introduced evidence of at least seven other arrests for offenses of which the defendant had never been tried or convicted.

Defendant contends that the introduction of this evidence denied him his right to a fair sentencing hearing. The State, on the other hand, argues that the evidence of the other crimes not resulting in convictions was properly introduced because it was reliable, subject to cross-examination, and bore directly on the defendant's general moral character and natural inclination to commit crime.

This court has dealt with the issue of the admissibility

of other-crimes evidence during a sentencing hearing. In *People v. La Pointe* (1981), 88 Ill. 2d 482, this court held:

"Whether a defendant had been prosecuted and convicted for other misconduct, proof of which is offered at a sentencing hearing, is not, in our judgment, controlling as to its admissibility. More important are the questions of relevancy and accuracy of the information submitted. *** The conduct testified to was relevant to a determination of a proper sentence in that it bore upon the likelihood or unlikelihood that defendant would commit other offenses; it appeared trustworthy; defendant had the opportunity to face and cross-examine the witness; and the accuracy of the information was not challenged." 88 Ill. 2d 482, 498-99.

In accordance with our reasoning and holding in *La Pointe*, we hold that the evidence of other crimes in the instant case was properly admitted. In each instance, the evidence of the crime was presented through the testimony of a witness with first-hand knowledge. Each witness was then subject to cross-examination by the defendant. The testimony was certainly relevant to a determination of a proper sentence, because it bore directly upon the likelihood that the defendant would commit other offenses.

## A STATEMENT OF AN UNKNOWN WITNESS THAT DEFENDANT "WOULD NOT BE TAKEN ALIVE"

It is the defendant's contention that, because Fred Ligarde, an FBI agent, testified that prior to defendant's arrest for a bank robbery the FBI received information that the defendant was dangerous and would not be taken alive and the source of that information was never identified, he was denied a fair sentencing hearing.

The State argues that Ligarde's testimony was relevant to the defendant's character and should have been admitted. In any event, the State argues that the defendant cannot now complain that the evidence was unreliable because the source was never established, where the defendant himself prevented the prosecution from establishing its

source. And, lastly, the State contends that even if the testimony was inadmissible, any error was cured when the trial judge sustained the defendant's objection to the statement and instructed the jury to disregard the testimony.

In support of his contention that agent Ligarde's statement constituted reversible error, the defendant quotes from another death penalty case, *People v. Dukes* (1957), 12 Ill. 2d 334. The defendant's assertion that the two cases are analogous is erroneous. In *Dukes*, the prosecutor, in his closing argument, had insinuated that the arresting officer had the right to take the defendant's life but that the police officer spared the defendant's life because he believed the jury would impose the death penalty. The trial court overruled the defendant's objection to the prosecutor's statement. This court held: "It seems unnecessary for us to say that this statement should not have been made, and that the court further erred in overruling the objection to this argument. The police officer, having apprehended the defendant without resistance, had no right to take his life and it was highly improper to tell the jury that the fact that his life had been spared was to be taken into consideration by them in fixing the penalty in this case." 12 Ill. 2d 334, 341-42.

The situation in *Dukes* differs from the situation in the instant case for several reasons. First, in the instant case a witness, not the prosecutor, made the statement in question. An incorrect statement made by a prosecutor in his closing argument is certainly more damaging to a defendant than a witness testifying to a hearsay statement. Second, it should be noted that in the instant case the defense counsel's objection to the witness' statement was immediately sustained by the trial judge. The following exchange took place:

"Q. What other information did you have regarding Mr. Ramirez?

A. We had information that he would not be taken alive—

MR. MENAKER: Objection.

THE COURT: Objection sustained. The jury is instructed to disregard that last remark.

MR. THEOBALD: May I be heard on that, Judge?

THE COURT: Ask the next question."

Third, and most importantly, the prosecution never argued that the statement should be taken into account by the jury in its decision to impose the death penalty. In fact, the jury was instructed that it was to disregard the statement.

We cannot agree with the defendant that agent Ligarde's testimony constituted reversible error based on this court's decision in *Dukes*. However, since we are concluding that defendant should be granted a new sentencing hearing, this alleged error becomes irrelevant.

### DEFENDANT'S ALLEGED PHONE CALL TO THE FBI

The defendant contends that he was prevented from presenting a mitigating factor to the jury. Defendant argues that he should have been allowed to show, through the testimony of FBI agent Fred Ligarde, that prior to his arrest in Texas for a bank robbery, he had phoned the FBI and told FBI agent Robert Baker that he did not want to hurt anyone and was contemplating surrender.

The State argues that the trial judge was correct in precluding the defendant from questioning agent Ligarde regarding a phone call that Ligarde had not received. Agent Ligarde, the State asserts, had no personal knowledge as to either the substance of the call or the identity of the caller, since he had not actually received the call. Agent Baker had received the call, so the State maintains only agent Baker or the defendant could testify as to the substance of the conversation.

The trial judge sustained the State's objections on the grounds that it would be double hearsay. However, the judge stated that if the defendant testified as to the conversation, then the FBI report which would allegedly cor-

roborate the defendant's testimony could be admitted. Defense counsel stated at that time that defendant would probably testify. However, defendant was never called to the stand and no other evidence was ever introduced regarding the alleged phone call.

Defendant's complaint that he was denied the opportunity to present evidence of this alleged phone call in mitigation is without merit. Defendant could have testified that he made the call and, as the trial judge pointed out, he could have corroborated that testimony with an FBI report. The defendant could also have called agent Baker to testify regarding the conversation. The defendant's argument that, since the trial judge did not allow a witness to testify regarding a conversation to which the witness was not even a party, he was prevented from presenting evidence in mitigation defies logic.

## THE ADMISSION OF DEFENDANT'S TRIAL TESTIMONY AT THE SENTENCING HEARING

During the sentencing hearing, the prosecution read portions of the defendant's trial testimony to the jury. Defendant argues that the use of his trial testimony punished him for exercising his constitutional right to testify at trial by preventing him from effectively defending himself at the sentencing hearing.

The State maintains that since defendant voluntarily testified at trial he waived his privilege against compulsory self-incrimination with respect to the testimony he gave, and that his testimony was admissible against him in any subsequent proceedings.

There are really two issues raised by the defendant. First, whether a defendant's testimony at a prior proceeding can be used against him in a subsequent proceeding in which he has invoked his fifth amendment right to remain silent. Second, whether the reading of defendant's testimony at the sentencing hearing defeats the purpose of

having a bifurcated trial, one phase to determine guilt or innocence and another phase to determine the sentence.

In *Harrison v. United States* (1968), 392 U.S. 219, 20 L. Ed. 2d 1047, 88 S. Ct. 2008, the United States Supreme Court held:

"In this case we need not and do not question the general evidentiary rule that a defendant's testimony at a former trial is admissible in evidence against him in later proceedings. A defendant who chooses to testify waives his privilege against compulsory self-incrimination with respect to the testimony he gives, and that waiver is no less effective or complete because the defendant may have been motivated to take the witness stand in the first place only by reason of the strength of the lawful evidence adduced against him." 392 U.S. 219, 222, 20 L. Ed. 2d 1047, 1051, 88 S. Ct. 2008, 2010.

In *Harrison*, the petitioner's testimony at his former trial regarding illegally obtained confessions was read into evidence at his new trial. The Supreme Court reversed the petitioner's conviction based on the reading of the testimony and held that "the petitioner testified only after the Government had illegally introduced into evidence three confessions, all wrongfully obtained, and the same principle that prohibits the use of confessions so procured also prohibits the use of any testimony impelled thereby—the fruit of the poisonous tree, to invoke a time-worn metaphor." 392 U.S. 219, 222, 20 L. Ed. 2d 1047, 1051, 88 S. Ct. 2008, 2010.

The factual situation in *Harrison* is distinguishable from the case at bar. It is clear that the testimony which defendant Ramirez gave at his trial was voluntarily given, and it did not pertain to any information illegally obtained. We hold that defendant Ramirez' testimony which is part of the record in this case could be read into evidence at the sentencing hearing.

Next we address the defendant's assertion that allowing the defendant's testimony from the guilt-innocence stage of

the trial to be read into evidence at the sentencing stage of the trial defeats the purpose of a bifurcated trial as enunciated in *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909.

In *Gregg*, the United States Supreme Court reasoned: "Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question. This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure—one in which the question of sentence is not considered until the determination of guilt has been made—is the best answer." 428 U.S. 153, 190-91, 49 L. Ed. 2d 859, 884, 96 S. Ct. 2909, 2933.

It is clear that the purpose of having a bifurcated trial in a capital trial is to insure that prejudicial evidence only relevant to sentencing is not admitted against the defendant before he has been found guilty. That does not mean that evidence which was produced at trial and is relevant to sentencing cannot be considered at the sentencing stage. At the sentencing stage it is important that the jury or judge consider all relevant evidence. Defendant voluntarily testified at trial. That decision to testify was a tactical decision—just as his decision not to testify at the sentencing hearing was a tactical decision. He cannot now contend that the testimony which he gave, which became part of the record, should not be used against him at his sentencing hearing when it is relevant to the sentence to be imposed. The purpose of having a bifurcated trial is not defeated by allowing the defendant's relevant trial testimony to be read at his sentencing hearing.

### EXPERT TESTIMONY AS TO DEFENDANT'S MENTAL STATE AT THE TIME OF THE MURDER

In the instant case, defendant tried to prove several mitigating factors. One of the factors he tried to prove was

that the "murder was committed while the defendant was under the influence of extreme mental or emotional disturbance, although not such as to constitute a defense to prosecution." Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c)(2).

The defendant argues that, by allowing Dr. James Cavanaugh, the prosecution's expert witness, to opine that the defendant was not acting under the influence of an extreme mental or emotional disturbance at the time of the murder, he was denied a fair sentencing hearing. Defendant asserts that, by allowing an expert to testify on an ultimate issue of fact, the trial court allowed the doctor to usurp the jury's duty as a sentencing body. We cannot agree.

Since the defendant himself raised the issue of his mental condition at the time of the offense, it was not improper for the State to try to disprove his assertion. Dr. Cavanaugh was a qualified expert in psychiatry; he had reviewed all of the defendant's psychiatric records and other relevant materials from which he could formulate an opinion. This court has held that an expert may give an opinion on a fact which is an ultimate issue of fact for the jury or judge to determine. In *People v. Covey* (1966), 34 Ill. 2d 195, a psychiatrist gave his opinion as to whether the defendant was "sexually dangerous," within the meaning of a new statute. The defendant urged that the expert's testimony invaded the province of the court as the trier of fact since it was an opinion as to an ultimate fact in issue. This court held: "While the question of whether an individual is a sexually dangerous person is one of fact, it is one which, by its nature, cannot be answered by a court or jury without hearing the opinions of those having peculiar and special knowledge in the fields of mental disorder and sexual aberration. In any event, as given in this case, the opinion of the psychiatrist was nevertheless an opinion only, and it still remained the function of the court to determine the issue from all the facts before it." 34 Ill. 2d

195, 197.

In the instant case, Dr. Cavanaugh's testimony was properly admitted. The defendant's contention that because there is no legal or medical definition of the word "extreme," the doctor was not qualified to testify as to its meaning is illogical. The doctor was giving his opinion as to whether, from all the data he had reviewed, the defendant was suffering from an extreme mental or emotional disturbance at the time of the murder. The admission of his testimony was proper. Since his opinion was just that, an opinion, the jury was still to make the ultimate determination. The defendant was not precluded from presenting expert testimony to the opposite effect on this issue.

Defendant also asserts that it was improper for Dr. Cavanaugh to testify that the defendant was sane at the time of the offense, since insanity was not at issue at the sentencing hearing. Since defendant himself raised the issue of his mental state at the time of the offense as a mitigating factor, it was proper for Dr. Cavanaugh to give his opinion as to the defendant's sanity.

### WHETHER THE PROSECUTION WAS PROPERLY ALLOWED AN OPENING AND REBUTTAL CLOSING ARGUMENT AT STAGE TWO OF THE SENTENCING HEARING

Defendant argues that he was denied a fair sentencing hearing because the trial judge allowed the prosecution to present an opening and rebuttal closing argument at stage two of the sentencing hearing even though the prosecution did not have a burden of proof at that stage.

The State argues that while it is true that it did not have a burden of proof at stage two, neither party had the burden of proof. The prosecution asserts, however, that as the moving party it was trying to establish that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Because the State was the moving party, it asserts, it was properly allowed rebuttal which

would enable it to make a final comment on the defenses raised. The moving party, the State argues, cannot anticipate every defense or answer to its motion and should, therefore, be allowed to respond to new matters raised therein.

At stage two, the jury must make the determination that there are no mitigating factors sufficient to preclude the imposition of the sentence of death. The State was trying to show, since it was the moving party, that the defendant should receive the sentence of death because there were no sufficient factors in mitigation to preclude imposition of that sentence. The State was properly given an original and rebuttal closing argument because, contrary to defendant's assertion, the State was bearing the affirmative of the issue, to show that the death penalty should be imposed.

## THE PROSECUTOR'S CLOSING ARGUMENT
## DURING STAGE TWO

The defendant argues that the prosecutor made numerous statements during his closing argument which were meant to frighten and prejudice the jury.

The State maintains that a review of both the defendant's and prosecution's closing arguments, and the entire record, demonstrates that the defendant's allegations are without merit. The statements that the defendant complains of, the State asserts, were proper comment on the evidence and the natural inferences to be drawn therefrom, or were an invited reply to the overreaching and improper comments made by defense counsel.

The defendant raises six different statements which he alleges were improper and caused the prosecutor's closing argument to be "flagrantly unconstitutional." Defendant asserts first that the prosecutor improperly voiced his personal opinion that the defendant's record was the worst he had ever seen. The State responds that, since the evidence

established that defendant had been convicted no less than 13 times for offenses ranging from assault and battery to bank robbery, had committed, but not been tried for, three bank robberies, two armed robberies, two escapes, and a burglary, the prosecutor's comment regarding the defendant's record was a proper comment on the evidence. Secondly, the defendant asserts that the prosecutor attempted to frighten the jury into voting for the death penalty by arguing that, if the jury did not vote for the death penalty, the defendant would be sent "back to prison to be paroled at the whim of the parole board." The State replies that the defendant waived this issue by failing to object, but that even if the defendant had not waived the issue, the statement by the prosecutor was nothing more than a plea to the jury to fearlessly administer the law. The State also contends that the defendant's own witness, W. V. Kauffman, admitted on the witness stand during cross-examination that the policies of the parole board were subject to dramatic change with each change in administration. Thirdly, the defendant argues that the prosecutor implied that it would be cheaper to execute the defendant than to keep him alive in prison. The defendant alleges that the prosecutor's remark that "Mr. Carey [defense counsel] told you that the resources of this County should be channeled so that we can keep one Roberto Ramirez in jail and that's the reason not to follow the law" implied that it would be cheaper to execute the defendant than to imprison him. The State argues that the defendant waived this issue by failing to object, but that even if the defendant had not waived the issue, the prosecutor clearly made no reference to the costs of imprisonment versus execution. Next the defendant asserts that the prosecutor misstated "crucial facts" in two instances, first when he stated, "If you find that Roberto Ramirez should be returned to the penitentiary, then the escape, the armed robberies, the murder is free," and, second, when the prosecutor stated that Dr.

Cavanaugh had testified that "narcotic addiction is a physiological factor" and "[h]as nothing to do with mental processes." The defendant argues that he had a 35-year Federal sentence left to serve and a possible term of imprisonment that he could receive in the instant case instead of the death penalty, so that the prosecutor's statement that he would go free was blatantly incorrect. The State argues that the prosecutor's remark was proper because if the defendant were not to be sentenced to death, the trial judge could impose a sentence which would run concurrently with the defendant's 35-year Federal sentence and the defendant would, therefore, not be in any worse a position than if no sentence were imposed. In regard to the prosecutor's remark regarding Dr. Cavanaugh's testimony, the State responds that the prosecutor's remark was a permissible inference from the doctor's testimony because the doctor had testified, in effect, that the defendant's addiction had not caused any noticeable brain damage. The defendant's penultimate claim of error regarding the prosecution's closing argument is that the prosecutor misstated the law when he told the jury that "[t]he law says if he committed these acts, he must be responsible." The State argues that not only did defendant waive this issue by failing to object, but any error that could have been made was harmless, due to the fact that defense counsel himself commented that the defendant was responsible for his own acts. Lastly, the defendant argues that the prosecutor falsely accused defense counsel of calling the State's witnesses perjurers and implied that defense counsel had misstated the evidence. The State responds that the prosecutor's statements were within the bounds of legitimate argument because the prosecutor can comment on the credibility of the witnesses. In any event, the State argues that since an objection to the prosecutor's remark regarding defense counsel was sustained, any possible error was harmless.

Since we have already decided that this case is to be remanded for a new sentencing hearing, it is highly unlikely that any of the same remarks that were made by the prosecutor during the original sentencing hearing will be repeated in the new sentencing hearing.

### DEFENSE COUNSEL'S ALLEGED FAILURE TO PROPERLY PRESERVE MERITORIOUS ISSUES FOR APPEAL

The defendant makes a very vague and general statement that "a number of grounds have been advanced on appeal" and states that because this was a death case, "a higher quality of representation must also apply to the trial attorney's preservation of trial errors for the record on appeal." The defendant further states that to "the extent that this Court concludes that various trial errors were not properly preserved by trial counsel (and are not plain error), Robert Ramirez was deprived of the effective assistance of trial counsel."

In the instant case, the defendant contends that he was denied effective assistance of counsel because his trial attorneys failed to preserve unspecified issues for review. The defendant cannot make a general assertion of incompetence without even pointing out specific instances where issues were not preserved and expect this court to determine whether his contention is meritorious. The defendant has failed to comply with Supreme Court Rule 341(e)(7), which provides that arguments made in support of issues raised in an appeal before this court "shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." (87 Ill. 2d R. 341(e)(7).) We will not address this general allegation.

In the instant case, we are of the opinion that error was committed during the defendant's sentencing hearing. While the defendant did not raise any issues concerning the trial on the merits, we have reviewed the entire record

for errors and have concluded that while we affirm the judgment of the circuit court finding the defendant guilty of attempted armed robbery and murder, the cumulative impact of the errors in the sentencing hearing render the sentence of death improper. (*People v. Whitlow* (1982), 89 Ill. 2d 322, 341.) The sentence of death is therefore vacated and the cause is remanded for a new sentencing hearing. We also note that neither the State nor the defendant raised the issue of the defendant being sentenced for the charge of attempted armed robbery. The record gives no indication that the defendant was ever sentenced on that charge. Therefore, this cause is also remanded for the purpose of determining the sentence to be imposed on the attempted-armed-robbery conviction.

*Affirmed in part and vacated*
*in part; cause remanded,*
*with directions.*

JUSTICE SIMON, specially concurring:

Although I agree with the court's conclusion in the case and with its holdings on many of the issues which lead it to that conclusion, I disagree with some of the court's observations, and for that reason I specially concur in the opinion in this case. The observations with which I disagree are the following:

First, there is no reason to address issues which may not arise in the further proceedings we have ordered. The death qualification of the last sentencing jury (98 Ill. 2d at 459-60) and the evidentiary ruling on the statement of the unknown witness (98 Ill. 2d at 461-63) both fall within this category. A new trier of fact will now decide what sentence should be imposed on the defendant. We do not know what items will be offered by the prosecution as evidence at the new hearing. It is premature to address these issues in this opinion.

Second, I disagree with the portion of the opinion headed "OTHER CRIMES EVIDENCE" (98 Ill. 2d at

460-61). Admission of testimony regarding eight other occurrences for which the defendant was neither tried nor convicted was, in my opinion, error. Defendant was convicted of murder and attempted armed robbery after a bench trial. Before the hearing in aggravation and mitigation, the defense attorney moved *in limine* to exclude evidence of the eight listed prior acts, arguing that they were inadmissible because the defendant had neither been tried for nor convicted of any of them. In addition to a previous armed robbery of the bank involved here, there was an escape and an attempted escape from jail, three more armed robberies, a burglary, and a theft of license plates, most of which occurred outside Illinois. The trial judge denied the motion *in limine*. The State presented a number of witnesses to the incidents. The prosecutor used the evidence of other crimes for which the defendant was never tried, following earlier actual convictions for 10 other offenses, to argue that the defendant continued his life of crime, and that, if the defendant did not receive the death penalty now, some of his prior criminal acts were "free," *i.e.* would go unpunished. The State spoke without distinction of these prior acts for which the defendant was neither tried nor convicted and of prior crimes for which the defendant had been tried and convicted. A jury, which is usually not experienced enough to distinguish between the reliability of evidence of prior crimes and prior convictions, was asked to consider both together. In effect, the jury was asked to treat prior crimes and prior convictions as equivalent aggravating factors in awarding the death sentence for the particular crimes at issue here.

There can be no doubt that a sentencing jury is allowed to consider a wider range of information than that which satisfies the ordinary rules of evidence. (*Williams v. New York* (1949), 337 U. S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079; *People v. Adkins* (1968), 41 Ill. 2d 297, 300-01.) Still, any matters considered must meet a standard of reliability and

accuracy. (*People v. Crews* (1967), 38 Ill. 2d 331, 337-38.) The question is whether the rules governing the admission of aggravating factors at a sentencing hearing conducted by a judge provide adequate safeguards in a death penalty case where a jury is authorized to decide whether the guilty defendant shall live or die. A jury of laymen is being asked to evaluate a wide range of information to determine whether to impose the ultimate penalty on a particular individual. The consequences for the defendant cannot be overstated. The trial court must take every precaution to insure that the jury's decision is based on the fullest information available, free of unreliable material and of appeals to prejudice and emotion. Evidence which might be appropriately considered in another sentencing hearing, particularly where a jury is not involved, may be too unreliable or unduly prejudicial in the context of deciding whether the death penalty should be imposed.

For these reasons, I disagree with the majority's holding that this case is controlled by our decision in *People v. La Pointe* (1981), 88 Ill. 2d 482 (98 Ill. 2d at 460-61). It is true that in *La Pointe* we said that the relevancy and accuracy of information submitted at a sentencing hearing is more important than whether or not the defendant had been prosecuted or convicted for the misconduct. (88 Ill. 2d 482, 498.) However, *La Pointe* did not involve sentencing by a jury after a bench trial. For that reason I do not regard *La Pointe* as setting a standard for all sentencing hearings in death and nondeath cases by both judges and juries. Although *La Pointe* was also a murder conviction, there was no possibility of the death penalty. There was no trial. The defendant entered an unnegotiated guilty plea and was then sentenced by a judge faced with the decision between natural-life or shorter-term imprisonment. At the sentencing hearing, the defendant did not object to the introduction of the prior-crime evidence, which involved only a single prior arrest, and did not dispute his guilt of the

prior offense. *La Pointe* is clearly distinguishable from the situation here, where, after a bench trial, a jury considering whether the death penalty should be imposed was confronted with evidence of eight prior acts offered for consideration along with 10 prior convictions. I submit that a higher standard of relevancy and accuracy is required in the special case of a jury considering the sentence of death than that which satisfied this court in *La Pointe*. In particular I am concerned by the fact that several of the prior crimes occurred outside Illinois and the defendant's opportunity to establish his innocence or explain his role was therefore limited unless he took the stand himself.

The decision here is inconsistent with our decision in *People v. Lampkin* (1983), 98 Ill. 2d 418. In that case the court said, "The defendant is entitled to a jury that is not prejudiced against him because of a prior arrest." (*People v. Lampkin* (1983), 98 Ill. 2d 418, 430.) While the prior-crime evidence in *Lampkin* was presented to the jury during the guilt phase rather than the sentencing phase, I feel the reasoning should apply whenever a jury is involved. Here, there was no jury during the guilt phase. In *Lampkin*, we held that evidence of a prior arrest for conduct for which the defendant was neither tried nor convicted could not have been admitted during the guilt phase of the trial. A sentencing jury must also be free from prejudicial information. The use of prior-crime evidence even in sentencing hearings has been allowed in this State only where sentencing is imposed by a judge rather than a jury (*e.g., People v. Ruiz* (1982), 94 Ill. 2d 245 (death sentence imposed by court after jury was waived; evidence of other crimes contained in defendant's written statement); *People v. Poll* (1980), 81 Ill. 2d 286 (attempted burglary and armed violence); *People v. Kelley* (1970), 44 Ill. 2d 315 (murder, sentence of 50 to 100 years); *People v. O'Neil* (1960), 18 Ill. 2d 461 (arson)) and in recent years only where the penalty of death is not involved (*People v. La Pointe* (1981), 88 Ill. 2d 482). *People v. Crews* (1967), 38 Ill.

2d 331, the seminal case in which this court reversed a sentence because of the erroneous admission of unreliable information in a sentencing hearing, was a death penalty case. *Crews* arose under an earlier Illinois statute which provided for sentencing by a judge rather than a jury. This court has never addressed the question of the use of prior-crime evidence in the special case of a jury impaneled to consider the death sentence.

Finally, I disagree with the court's holding that the proffered evidence of defendant's phone call to the FBI was properly excluded as double hearsay. (98 Ill. 2d at 463-64.) Reliable hearsay can be admitted in sentencing hearings. (See *Williams v. New York* (1949), 337 U.S. 241, 93 L. Ed. 1337, 69 S. Ct. 1079 (sentencing judge's use of additional information in death sentence hearing does not violate due process); *People v. Adkins* (1968), 41 Ill. 2d 297, 301 (sentencing judge is not limited to information allowed by rules of evidence); *People v. Henderson* (1976), 39 Ill. App. 3d 1065 (hearsay evidence allowed in sentencing hearing).) This phone call was offered by the defendant as evidence in mitigation; while it is not certain that the defendant will again offer it at his second sentencing hearing, I address it because of my feeling that a defendant faced with a possible death sentence should not be precluded from offering any evidence which might serve to mitigate his offense. A death sentencing body should be permitted to consider all relevant evidence in mitigation in order to insure that each defendant receives the individual consideration which is especially important in capital cases. *Cf. Eddings v. Oklahoma* (1982), 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869; *Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965.

Despite these specific disagreements, I concur in the court's holding that the verdicts of guilty be affirmed, the sentence of death be vacated, and the cause be remanded for a new sentencing hearing.